JOSEPH P. GANIM ET AL. *v.* SMITH AND
WESSON CORPORATION ET AL.
(SC 16465)

Borden, Norcott, Palmer, Zarella and Klaczak, Js.

Argued March 21—officially released October 9, 2001

*Bourke G. Spellacy*, with whom were *Barbara Frederick* and, on the brief, *Richard S. Order, Robert M. DeCrescenzo, Robert R. Simpson, Mark T. Anastasi, Dennis A. Henigan*, pro hac vice, *Brian J. Siebel*, pro hac vice, *Jonathan E. Lowy*, pro hac vice, *Ruchi Bhowmik*, pro hac vice, and *Allen K. Rostron*, pro hac vice, for the appellants (plaintiffs).

*Lawrence S. Greenwald*, pro hac vice, with whom were *David J. Elliott, Robert J. Cooney, Timothy G. Atwood, Christopher Renzulli*, pro hac vice, *J. Michael Sulzbach, Carla Ottaviano, Peter C. Schwartz*, pro hac vice, *Richard G. Kascak, Jr., Serge G. Mihaly, Charles A. Deluca, Andrew J. Buzzi, Jr.*, and *John Conway*, and, on the brief, *James P. Dorr, John F. Renzulli*, pro hac vice, *William M. Griffin III*, pro hac vice, *Michael C. Hewitt*, pro hac vice, *Mark K. Ostrowski, Thomas E. Fennell*, pro hac vice, *Timothy A. Bumann*, pro hac vice, *Charles L. Coleman*, pro hac vice, *James R. Branit*, pro hac vice, *Robert L. Joyce*, pro hac vice, *Gary R. Long*, pro hac vice, *Jeffrey S. Nelson*, pro hac vice, *Brian W. Smith, Harold R. Mayberry, Jr.*, pro hac vice, and *Douglas E. Kliever*, pro hac vice, for the appellees (defendant Sturm, Ruger and Company, Inc., et al.).

*Raymond J. Plouffe, Jr.*, for the appellees (defendant Scott Moss Gun and Tackle, Inc., et al.).

*Richard Blumenthal*, attorney general, with whom were *Gregory T. D'Auria*, associate attorney general, and, on the brief, *Stephen R. Park* and *Perry Zinn-Rowthorn*, assistant attorneys general, for the office of the attorney general as amicus curiae.

*Opinion*

BORDEN, J. The dispositive issue of this appeal is whether the plaintiffs, a Connecticut municipality and

its mayor, have standing to assert the various causes of action that they have alleged against the defendants, who are various firearms manufacturers, trade associations and retail sellers.[1] The plaintiffs, the city of Bridgeport and its mayor, Joseph P. Ganim, in his official

---

[1] The defendant manufacturers are: Smith and Wesson Corporation, a Delaware corporation with its principal place of business in Springfield, Massachusetts; Sturm, Ruger and Company, a Delaware corporation with its principal place of business in Southport, Connecticut; Beretta U.S.A. Corporation, a Maryland corporation with its principal place of business in Accokeek, Maryland; Fabrica D'Armi Pietro Beretta S.P.A., an Italian corporation that is the parent company of Beretta U.S.A. Corporation; Colt's Manufacturing Company, a Delaware corporation with its principal place of business in Hartford, Connecticut; Glock, Inc., a Georgia corporation with its principal place of business in Smyrna, Georgia; Glock, GmbH, an Austrian corporation that manufactures and sells handgun parts to Glock, Inc.; Taurus International Manufacturing, Inc., a Florida corporation with its principal place of business in North Miami Beach, Florida; Forjas Taurus, S.A., a Brazilian corporation that manufactures and sells handgun parts to Taurus International Manufacturing, Inc.; Sig Arms, Inc., a Delaware corporation with its principal place of business in Exeter, New Hampshire; Lorcin Engineering Company, Inc., a California corporation with its principal place of business in Mira Loma, California; Bryco Arms, a Nevada corporation with its principal place of business in Costa Mesa, California; Davis Industries, a California corporation with its principal place of business in Chino, California; Charco 2000, Inc., a Connecticut corporation with its principal place of business in Shelton, Connecticut; Charter Arms, Inc., a Connecticut corporation with its principal place of business in Stratford, Connecticut; International Armament Corporation doing business as Interarms Industries, Inc., a Delaware corporation with its principal place of business in Alexandria, Virginia; Heckler and Koch, Inc., a Virginia corporation with its principal place of business in Sterling, Virginia; Heckler and Koch, GmbH, a German corporation with its principal place of business in Germany; Browning Arms Company, a Utah corporation with its principal place of business in Morgan, Utah; B.L. Jennings, Inc., a Nevada corporation with its principal place of business in Carson City, Nevada; and Navegar, Inc., doing business as Intratec, a Florida corporation with its principal place of business in Miami, Florida.

The defendant trade associations are: American Shooting Sports Coalition, Inc., whose principal place of business is in Georgia; National Shooting Sports Foundation, Inc., whose principal place of business is in Newtown, Connecticut; and Sporting Arms and Ammunition Manufacturers' Institute, Inc., whose principal place of business is in Newtown, Connecticut.

The defendant gun retailers are: Connecticut Gun Exchange, Inc., a Connecticut corporation with its principal place of business in Monroe, Connecti-

capacity, appeal[2] from the judgment of the trial court granting the defendants' motion to dismiss their claims for lack of standing. The plaintiffs claim that they have standing: (1) under General Statutes § 7-148 (c) (1) (A) and (7) (H) (xi),[3] which are part of the Home Rule Act; (2) under the common law of nuisance; (3) because they have alleged injuries and damages that are direct as to them, and are not derived from any other entity's or person's injuries; (4) under General Statutes §§ 42-

cut; Frank D'Andrea doing business as D'Andrea's Gun Case, whose principal place of business is in Stratford, Connecticut; K-5 Arms Exchange, Inc., a Connecticut corporation with its principal place of business in Stratford, Connecticut; Meriden Trading Post, Inc., a Connecticut corporation with its principal place of business in Meriden, Connecticut; Hansen and Company, a Connecticut corporation with its principal place of business in Southport, Connecticut; Hallowell and Company, Inc., a Connecticut corporation with its principal place of business in Greenwich, Connecticut; Arms and Munitions of Fairfield, Inc., a Connecticut corporation with its principal place of business in Monroe, Connecticut; Gary Brown, Donald Brown and Ken Johnson doing business as The Gun Rack, whose principal place of business is in Thompson, Connecticut; Scott Moss doing business as Scott Moss Gun and Tackle, Inc., whose principal place of business is in Norwalk, Connecticut; A Nice Pawn Shop, Inc., a Connecticut corporation with its principal place of business in Milford, Connecticut; Connecticut Finance Corporation doing business as Joe Davis Pawn Shop, a Connecticut corporation with its principal place of business in Bridgeport, Connecticut; and Connecticut Pawn and Gun, a Connecticut corporation with its principal place of business in Bridgeport, Connecticut.

[2] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[3] General Statutes § 7-148 (c) provides in relevant part: "Powers. Any municipality shall have the power to do any of the following, in addition to all powers granted to municipalities under the constitution and general statutes:

"(1) Corporate powers. (A) Contract and be contracted with, sue and be sued, and institute, prosecute, maintain and defend any action or proceeding in any court of competent jurisdiction . . . .

"(7) Regulatory and police powers. . . .

"(H) Public health and safety. . . .

"(xi) Provide for the health of the inhabitants of the municipality and do all things necessary or desirable to secure and promote the public health . . . ."

Although the legislature has made technical changes to § 7-148 since the institution of this action, the changes are not relevant to this appeal. References in this opinion are to the current revision of that statute.

110a through 42-110q, the Connecticut Unfair Trade
Practices Act (CUTPA);[4] and (5) under General Statutes

[4] The state's attorney general, as amicus curiae, confines his arguments
to the plaintiffs' standing under the Home Rule Act and CUTPA.

The following is the text of CUTPA; General Statutes §§ 42-110a through
42-110q.

General Statutes § 42-110a provides: "As used in this chapter:

"(1) 'Commissioner' means the Commissioner of Consumer Protection;

"(2) 'Documentary material' means the original or a copy of a book,
record, report, memorandum, paper, communication, tabulation, map, chart,
photograph, mechanical transcription, or other tangible document or
recording, wherever situate;

"(3) 'Person' means a natural person, corporation, limited liability com-
pany, trust, partnership, incorporated or unincorporated association, and
any other legal entity;

"(4) 'Trade' and 'commerce' means the advertising, the sale or rent or
lease, the offering for sale or rent or lease, or the distribution of any services
and any property, tangible or intangible, real, personal or mixed, and any
other article, commodity, or thing of value in this state."

General Statutes § 42-110b provides: "Unfair trade practices prohibited.
Legislative intent. (a) No person shall engage in unfair methods of competi-
tion and unfair or deceptive acts or practices in the conduct of any trade
or commerce.

"(b) It is the intent of the legislature that in construing subsection (a) of
this section, the commissioner and the courts of this state shall be guided
by interpretations given by the Federal Trade Commission and the federal
courts to Section 5 (a)(1) of the Federal Trade Commission Act (15 USC
45 [a][1]), as from time to time amended.

"(c) The commissioner may, in accordance with chapter 54, establish by
regulation acts, practices or methods which shall be deemed to be unfair
or deceptive in violation of subsection (a) of this section. Such regulations
shall not be inconsistent with the rules, regulations and decisions of the
federal trade commission and the federal courts in interpreting the provi-
sions of the Federal Trade Commission Act.

"(d) It is the intention of the legislature that this chapter be remedial and
be so construed."

General Statutes § 42-110c provides: "Exceptions. (a) Nothing in this chap-
ter shall apply to: (1) Transactions or actions otherwise permitted under
law as administered by any regulatory board or officer acting under statutory
authority of the state or of the United States; or (2) acts done by the publisher,
owner, agent or employee of a newspaper, periodical or radio or television
station in the publication or dissemination of an advertisement, where the
publisher, owner, agent or employee did not have knowledge of the false,
misleading, unfair or deceptive character of the advertisement, and did not
have direct financial interest in the sale or distribution of the advertised
product or service.

"(b) The burden of proving exemption, as provided in this section, from the provisions of this chapter shall be upon the person claiming the exemption."

General Statutes § 42-110d provides: "Investigation. Hearing. Orders. Enforcement. Disclosure of information. (a) For the purposes of this chapter the commissioner shall have the power to order an investigation and examination to be made. In addition to other powers conferred upon the commissioner by this chapter, the commissioner or his authorized representatives may issue subpoenas to any person involved in any matter under investigation and examination, administer an oath or affirmation to any person, and conduct hearings in aid of any investigation or examination, provided none of the powers conferred by this chapter shall be used for the purpose of compelling any natural person to furnish testimony or evidence which might tend to incriminate him or subject him to a penalty or forfeiture.

"(b) Said commissioner or his authorized representatives shall have the right to (1) enter any place or establishment within the state, at reasonable times, for the purpose of making an investigation; (2) check the invoices and records pertaining to costs and other transactions of commodities; (3) take samples of commodities for evidence upon tendering the market price therefor to the person having such commodity in his custody; (4) subpoena documentary material relating to such investigation; and (5) have access to, for the purpose of examination, documentary material and the right to copy such documentary material of any person being investigated or proceeded against. The commissioner or his authorized representatives shall have power to require by subpoena the attendance and testimony of witnesses and the production of all such documentary material relating to any matter under investigation.

"(c) In addition to other powers conferred upon the commissioner, said commissioner may execute in writing and cause to be served by certified mail an investigative demand upon any person suspected of using, having used or about to use any method, act or practice declared by section 42-110b to be unlawful or upon any person from whom said commissioner wants assurance that section 42-110b has not, is not or will not be violated. Such investigative demand shall contain a description of the method, act or practice under investigation, provide a reasonable time for compliance, and require such person to furnish under oath or otherwise, as may be specified in said demand, a report in writing setting forth relevant facts or circumstances together with documentary material.

"(d) Said commissioner, in conformance with sections 4-176e to 4-185, inclusive, whenever he has reason to believe that any person has been engaged or is engaged in an alleged violation of any provision of this chapter, shall mail to such person, by certified mail, a complaint stating the charges and containing a notice of a hearing, to be held upon a day and at a place therein fixed at least fifteen days after the date of such complaint. The person so notified shall have the right to file a written answer to the complaint and charges therein stated and appear at the time and place so fixed for such hearing, in person or otherwise, with or without counsel, and submit testimony and be fully heard. Any person may make application, and upon good

cause shown shall be allowed by the commissioner to intervene and appear in such proceeding by counsel or in person. The testimony in any such proceeding, including the testimony of any intervening person, shall be under oath and shall be reduced to writing by the recording officer of the hearing and filed in the office of the commissioner. The commissioner or his authorized representatives shall have the power to require by subpoena the attendance and testimony of witnesses and the production of any documentary material at such proceeding. If upon such hearing the commissioner is of the opinion that the method of competition or the act or practice in question is prohibited by this chapter, the commissioner shall make a report in writing to the person complained of in which he shall state his findings as to the facts and shall forward by certified mail to such person an order to cease and desist from using such methods of competition or such act or practice, or, if the amount involved is less than five thousand dollars, an order directing restitution, or both. The commissioner may apply for the enforcement of any cease and desist order, order directing restitution or consent order issued under this chapter to the superior court for the judicial district of Hartford, or to any judge thereof if the same is not in session, for orders temporarily and permanently restraining and enjoining any person from continuing violations of such cease and desist order, order directing restitution or consent order. Such application for a temporary restraining order, temporary and permanent injunction, order directing restitution and for such other appropriate decree or process shall be brought and the proceedings thereon conducted by the Attorney General.

"(e) In addition to any injunction issued pursuant to subsection (d) of this section, the court may make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property, real or personal, which may have been acquired by means of any practices prohibited by this chapter, including the appointment of a receiver or the revocation of a license or certificate authorizing the person subject to the order or injunction to engage in business in this state, or both.

"(f) The commissioner or the Attorney General or their employees shall disclose, in accordance with the provisions of the Freedom of Information Act, as defined in section 1-200, all records concerning the investigation of any alleged violation of any provision of this chapter, including, but not limited to, any complaint initiating an investigation and all records of the disposition or settlement of a complaint. For purposes of this section, 'disposition' shall include the following action or nonaction with respect to any complaints or investigations: (A) No action taken because of (i) a lack of jurisdiction; (ii) unsubstantiated allegations or (iii) a lack of sufficient information to draw a conclusion, as determined by the commissioner, after investigation; (B) referral to another state agency, or to a federal or local agency, or to law enforcement authorities; (C) an acceptance of an assurance of voluntary compliance in accordance with the provisions of section 42-110j; and (D) formal action taken, including the institution of administrative proceedings pursuant to subsection (d) of this section or court proceedings

§ 52-572m (b), which is part of the Connecticut Product

pursuant to section 42-110m, 42-110o or 42-110p. The commissioner may withhold such records from disclosure during the pendency of an investigation or examination held in accordance with subsection (a) of this section, but in no event shall the commissioner withhold any such records longer than a period of eighteen months after the date on which the initial complaint was filed with the commissioner or after the date on which the investigation or examination was commenced, whichever is earlier. Nothing herein shall be deemed to affect the rights of litigants, including parties to administrative proceedings, under the laws of discovery of this state."

General Statutes § 42-110e provides: "Appeals. Any person required by an order of the commissioner to cease and desist from using any method, act or practice declared unlawful by section 42-110b or to make restitution may appeal therefrom in accordance with the provisions of section 4-183. Appeals under this section shall be privileged cases to be heard by the court as soon after the return day as shall be practicable."

General Statutes § 42-110f provides: "Powers of receiver. Restitution. Judicial supervision. When a receiver is appointed by the court pursuant to this chapter, he shall have the power to sue for, collect, receive and take into his possession all the goods and chattels, rights and credits, moneys and effects, lands and tenements, books, records, documents, papers, choses in action, bills, notes and property of every description, derived by, or aiding in any manner, any practice declared to be illegal and prohibited by this chapter, including property with which such property has been mingled if it cannot be identified in kind because of such commingling, and to sell, convey, and assign the same and hold and dispose of the proceeds thereof under the direction of the court. Any person who has suffered damages as a result of the use or employment of any unlawful practices and submits proof to the satisfaction of the court that he has in fact been damaged, may participate with general creditors in the distribution of the assets to the extent he has sustained out-of-pocket losses. In the case of a partnership or business entity, the receiver shall settle the estate and distribute the assets under the direction of the court. The court shall have jurisdiction of all questions arising in such proceedings and may make such orders and judgments therein as may be required."

General Statutes § 42-110g provides: "Action for damages. Class actions. Costs and fees. Equitable relief. Jury trial. (a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. Proof of public interest or public injury shall not be required in any action brought under this section. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper.

"(b) Persons entitled to bring an action under subsection (a) of this section

may, pursuant to rules established by the judges of the Superior Court, bring a class action on behalf of themselves and other persons similarly situated who are residents of this state or injured in this state to recover damages.

"(c) Upon commencement of any action brought under subsection (a) of this section, the plaintiff shall mail a copy of the complaint to the Attorney General and the Commissioner of Consumer Protection and, upon entry of any judgment or decree in the action, shall mail a copy of such judgment or decree to the Attorney General and the Commissioner of Consumer Protection.

"(d) In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery. In a class action in which there is no monetary recovery, but other relief is granted on behalf of a class, the court may award, to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorneys' fees. In any action brought under this section, the court may, in its discretion, order, in addition to damages or in lieu of damages, injunctive or other equitable relief.

"(e) Any final order issued by the Department of Consumer Protection and any permanent injunction, final judgment or final order of the court made under section 42-110d, 42-110m, 42-110o or 42-110p shall be prima facie evidence in an action brought under this section that the respondent or defendant used or employed a method, act or practice prohibited by section 42-110b, provided this section shall not apply to consent orders or judgments entered before any testimony has been taken.

"(f) An action under this section may not be brought more than three years after the occurrence of a violation of this chapter.

"(g) In any action brought by a person under this section there shall be a right to a jury trial except with respect to the award of punitive damages under subsection (a) of this section or the award of costs, reasonable attorneys' fees and injunctive or other equitable relief under subsection (d) of this section."

General Statutes § 42-110h provides: "Class actions. As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this section may be conditional, and it may be amended before decision on the merits. An order issued under this section shall be immediately appealable by either party."

General Statutes § 42-110j provides: "Voluntary compliance. In the administration of this chapter, the commissioner may accept an assurance of voluntary compliance with respect to any method, act or practice deemed in violation of this chapter from any person alleged to be engaged or to have been engaged in such method, act or practice. Such assurance may include an amount as restitution to aggrieved persons. No such assurance of voluntary compliance shall be considered an admission of violation for any purpose. Matters thus closed may at any time be reopened by the

commissioner for further proceedings in the public interest."

General Statutes § 42-110k provides: "Commissioner's enforcement powers. Court orders. If any person fails or refuses to file any statement or report, or obey any subpoena or investigative demand issued by the commissioner or his authorized representatives, the commissioner may, after notice, apply to the superior court for the judicial district of Hartford, which court, after a hearing thereon, may issue an order: (1) Granting injunctive relief to restrain the person from engaging in the advertising or sale of any commodity or the conduct of any trade or commerce that is involved in the alleged or suspected violation; (2) vacating, annulling or suspending the corporate charter of a corporation created by or under the laws of Connecticut or revoking or suspending the certificate of authority to do business in this state of a foreign corporation or revoking or suspending any other licenses, permits or certificates issued pursuant to law to such person which are used to further the allegedly unlawful practice; and (3) granting such other relief as may be required, until the person files the statement or report, or obeys the subpoenas or investigative demand. Any disobedience of any final order entered under this section by any court shall be punished as a contempt thereof."

General Statutes § 42-110l provides: "Assistance by court prosecutors. The various state's attorneys and prosecuting attorneys shall lend to the commissioner or Attorney General such assistance as either may request in the commencement and prosecution of actions pursuant to this chapter."

General Statutes § 42-110m provides: "Restraining orders or injunctions. Relief. (a) Whenever the commissioner has reason to believe that any person has been engaged or is engaged in an alleged violation of any provision of this chapter said commissioner may proceed as provided in sections 42-110d and 42-110e or may request the Attorney General to apply in the name of the state of Connecticut to the Superior Court for an order temporarily or permanently restraining and enjoining the continuance of such act or acts or for an order directing restitution and the appointment of a receiver in appropriate instances, or both. Proof of public interest or public injury shall not be required in any action brought pursuant to section 42-110d, section 42-110e or this section. The court may award the relief applied for or so much as it may deem proper including reasonable attorney's fees, accounting and such other relief as may be granted in equity. In such action the commissioner shall be responsible for all necessary investigative support.

"(b) Nothing contained in this chapter shall be construed as a limitation upon the power or authority of the state, the attorney general or the commissioner to seek administrative, legal or equitable relief as provided by other statutes or at common law."

General Statutes § 42-110n provides: "Consent orders. (a) In the administration of this chapter, the commissioner, any time after the issuance of a complaint provided for in subsection (d) of section 42-110d, may accept an agreement by any person charged with violating the provisions of section 42-110b to enter into a written consent order in lieu of an adjudicative

hearing. The acceptance of a consent order shall be within the complete discretion of the commissioner or such presiding officer as had been designated by the commissioner.

"(b) The consent order provided for in subsection (a) of this section shall contain: (1) An admission of all jurisdictional facts; (2) an express waiver of the right to seek judicial review or otherwise to challenge or contest the validity of the order; (3) a provision that the complaint may be used in construing the terms of the consent order; (4) a statement that the consent order shall have the same force and effect as an order entered after a full hearing and shall become final when issued; (5) a specific assurance of discontinuance of each of the acts alleged in the complaint; (6) the signature of each of the individual respondents or his counsel; and (7) the signature of the commissioner or of his authorized representative.

"(c) Negotiations leading up to the acceptance of a consent order are not open to the public. The consent order itself is a matter of public record.

"(d) A consent order shall have the same force and effect as a cease and desist order issued pursuant to subsection (d) of section 42-110d."

General Statutes § 42-110o provides: "Civil penalties. (a) Any person who violates the terms of a temporary restraining order or an injunction issued under subsection (d) of section 42-110d or subsection (a) of section 42-110m shall forfeit and pay to the state a civil penalty of not more than twenty-five thousand dollars per violation. For purposes of this section the court issuing the injunction shall retain jurisdiction, and the cause shall be continued, and in such cases the Attorney General acting in the name of the state may petition for recovery of civil penalties.

"(b) In any action brought under section 42-110m, if the court finds that a person is wilfully using or has wilfully used a method, act or practice prohibited by section 42-110b, the Attorney General, upon petition to the court, may recover, on behalf of the state, a civil penalty of not more than five thousand dollars for each violation. For purposes of this subsection, a wilful violation occurs when the party committing the violation knew or should have known that his conduct was a violation of section 42-110b."

General Statutes § 42-110p provides: "Dissolution, suspension or forfeiture of corporate franchise for violation of injunction. Upon petition by the Attorney General, the superior court for the judicial district of Hartford may, in its discretion, order the dissolution or suspension or forfeiture of the franchise of any corporation which violates the terms of any injunction issued under section 42-110m."

General Statutes § 42-110q provides: "Service contract agreements. Fee disclosure required. (a) For the purposes of this section: (i) 'Service contractor' is defined as a person engaged in the business of repairing, overhauling, adjusting, assembling or disassembling consumer goods; (ii) 'person' means a natural person, corporation, limited liability company, trust, partnership, incorporated or unincorporated association, and any other legal entity; (iii) 'consumer goods' means any article purchased, leased or rented primarily for personal, family or commercial purpose.

Liability Act.[5] The plaintiffs also claim that the trial court improperly dismissed their claims because a motion to dismiss may not be used to challenge issues of proximate causation, which, they contend, were the gravamen of the defendants' motion to dismiss. The defendants counter that the plaintiffs lack standing because the harms that they alleged are too indirect and remote from the defendants' conduct, and are derivative of others' injuries. We agree with the defendants that the plaintiffs lack standing. Accordingly, we affirm the judgment of the trial court dismissing their claims.[6]

The plaintiffs brought this action, based on a common set of factual allegations, giving rise to nine counts. The first seven counts, and the ninth count, were directed at all of the defendants. The first count alleged liability under the Product Liability Act. The second and third

"(b) It shall be an unfair or deceptive trade practice, in violation of this chapter, for any service contractor to fail to disclose to a prospective customer, at the time the prospective customer makes initial contact by any means with the service contractor, that a service call made by the service contractor to the home or business of the prospective customer will require the payment by the prospective customer to the service contractor of separate and distinct fees for the following, if such is the case: (i) Service charge, defined as the fee charged by the service contractor to respond to the request for services; (ii) labor charge."

[5] General Statutes § 52-572m (b) provides: " 'Product liability claim' includes all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product. 'Product liability claim' shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent."

[6] This conclusion renders it unnecessary to consider certain other claims of the plaintiffs on appeal, namely, that their claims are not preempted by state law regarding guns, and that they were not required to enact an ordinance in order to gain the relief that they seek. We also are not required to consider the separate claim raised by only certain of the defendants, namely, the trade associations and Scott Moss Gun and Tackle, Inc., that the claims presented by the plaintiffs are nonjusticiable.

counts alleged CUTPA violations. The fourth count alleged public nuisance. The fifth and sixth counts alleged negligence. The seventh count alleged a civil conspiracy. The ninth count alleged unjust enrichment. The eighth count, which was directed only at the retailers, alleged a civil conspiracy. The plaintiffs sought monetary and injunctive relief. The defendants moved to dismiss the entire complaint for lack of standing. The trial court granted the motion and rendered judgment accordingly. This appeal followed.

## I

## THE PLAINTIFFS' ALLEGATIONS

"It is well established that [i]n ruling upon whether a complaint survives a motion to dismiss, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *Lawrence Brunoli, Inc.* v. *Branford*, 247 Conn. 407, 410–11, 722 A.2d 271 (1999). That principle does not apply, however, to legal conclusions alleged. *American Laundry Machinery, Inc.* v. *State*, 190 Conn. 212, 217, 459 A.2d 1031 (1983). The plaintiffs' allegations, including all facts necessarily implied therefrom, are as follows.

The plaintiffs made a number of specific allegations against the three groups of defendants. With respect to the manufacturers, they alleged that handgun manufacturers have for years had the ability to design handguns to be self-locking and childproof, and to prevent handguns from being fired by an unauthorized and unintended user. These feasible devices would prevent firearm injuries and deaths that occur in Bridgeport when children and other unauthorized and unintended users gain access to guns and are incapable of handling them safely and lawfully. Manufacturers have not taken

adequate and reasonable measures to make the guns safer in order to prevent foreseeable injuries and deaths suffered by Bridgeport residents. The manufacturers promote and distribute handguns lacking in such warnings that would prevent shootings by unauthorized and unintended users.

The plaintiffs also alleged that the manufacturers have for years engaged in a conspiracy to mislead and deceive Bridgeport and its residents regarding the safety of handguns. The defendants advertise the fallacy that the use of handguns will increase home safety, when research demonstrates that handguns actually increase the risk of homicide, suicide, and both intentional and unintentional injuries. The defendants have for years knowingly sold guns in a manner that foreseeably leads to the guns flowing into an illegal market that, in turn, supplies guns to criminals and other unauthorized users. The defendants' failure to implement sufficient controls over the methods of distribution has fueled the illegal market, which in turn has fueled crime in Bridgeport.

As a result, the plaintiffs alleged, Bridgeport has suffered irreparable harm and financial harm, including additional expenses for police services, emergency services, and expenses for pension benefits, health care, social services and necessary facilities. In addition, as a result it has suffered loss of investment, economic development and tax revenues due to lost productivity. One particular harm that Bridgeport has suffered is the victimization of its citizens, particularly its children, who are injured or killed because of the alleged conduct of the defendants.

The plaintiffs also alleged that those manufacturers located in the United States; see footnote 1 of this opinion; design, manufacture, assemble, market, advertise and sell "handguns that have been or could be fired

by unauthorized and/or unintended users in Bridgeport and the State of Connecticut." Those manufacturers located in other countries; see footnote 1 of this opinion; design, manufacture, market, advertise and sell "handgun parts and handguns" to a domestic manufacturer "that have been or could be fired by unauthorized and/or unintended users in Bridgeport and the State of Connecticut."

With respect to the trade associations, the plaintiffs alleged that they are "composed of handgun manufacturers and sellers, including some or all of the manufacturer/seller defendants." The plaintiffs made no specific allegations regarding any conduct of the associations. The specific allegations against the retail sellers are that they "regularly [sell] and [advertise] handguns that have been or could be fired by unauthorized and/or unintended users in Bridgeport and the State of Connecticut."

Under the heading, "The Presence of Illegal and Unsafe Handguns and Irresponsible Sales In and Around Bridgeport," the plaintiffs also alleged as follows. Bridgeport is faced with high levels of violent crime, and the violence attributed to handguns destroys families and communities, and injures and takes the lives of intended and unintended victims. In 1996, more than 34,000 people nationwide were killed with handguns, of which more than 14,300 were homicides, more than 18,100 were suicides, and more than 1100 were from unintentional shooting. Approximately 99,000 people are treated annually in hospital emergency rooms for nonfatal firearm injuries, of which approximately 20,000 are victims of unintentional shootings caused primarily by handguns. In Bridgeport, the use of handguns has caused and continues to cause hundreds of deaths and injuries.

Handgun violence has a crippling effect on Bridgeport's minority communities. Of the total fatalities

attributed to handgun violence in Bridgeport, more than 80 percent were African-American or Hispanic.

A number of those killed by handguns in Bridgeport were children under the age of fifteen, and in Connecticut, from 1983 to 1995, gun homicides by juveniles tripled, while nongun homicides declined. Handgun violence negatively has impacted the lifestyle of children in certain residential communities in Bridgeport.

Under the subheading, "Design, Manufacture and Sale of Unsafe Products," the plaintiffs alleged as follows. The defendants' handguns are inherently and unreasonably dangerous because they enable persons who gain access to them, including children and adolescents who cannot properly handle them or understand their risks, to fire them. It is, however, feasible to design handguns that do not fire when handled by unauthorized and unintended users. The federal General Accounting Office estimates that 23 percent of the annual 1500 unintentional shooting deaths nationwide occur because the gun user was not aware that the gun's firing chamber was loaded, and there are many other similar nonfatal shooting injuries. The same office estimates that 35 percent of all unintentional shooting deaths involve gun users between the ages of thirteen and eighteen. The plaintiffs alleged further that the defendants know or should know that adolescents are attracted to accessible handguns and discount the risks associated with them.

The design of the defendants' handguns also result in thousands of adolescent suicides annually, nationwide. The risk of potential adolescent suicide doubles when a handgun is kept in the home. Every six hours, a youth aged ten through nineteen commits suicide with a handgun; handguns are used in 65 percent of male teen suicides and 47 percent of female teen suicides. In addition, the design of the defendants' handguns results in

thousands of homicides and assaults by unauthorized users, including juveniles, nationwide.

The defendants' handguns are also inherently and unreasonably dangerous because they are distributed without adequate warnings and instructions regarding their risks and their proper storage. In fact, the handguns are marketed in a manner that suggests that they do not pose such risks and that encourages unsafe storage practices. An additional feature of inherent dangerousness is that their design insufficiently warns all foreseeable users, including unauthorized and unintended users, that a round of ammunition may be in the firing chamber when the weapon appears to be unloaded.

The plaintiffs alleged further that the defendants reasonably should have foreseen that: their handguns would fall into the hands of unauthorized and unintended users; and without improved warnings and safety features, the guns would be used in unpreventable shootings by such users. Many of these shootings, including those in Bridgeport, are unintentional, often by children who do not fully understand the risks associated with a gun and how properly to handle a gun. Large numbers of adolescent suicides, homicides and assaults by the use of guns by unauthorized users are due to the lack of adequate warnings and safety features.

When the defendants designed, manufactured and distributed their handguns, they knew or should have known of their unreasonable dangerousness, and they were aware of safety designs and warnings that would prevent or decrease these dangers. The defendants failed to remedy these deficiencies.

Under the subheading, "False and Misleading Advertising," the plaintiffs alleged the following: for years, the defendants have conspired to mislead and deceive

the residents of Bridgeport and of the state of Connecticut regarding the safety of handguns, in the following manners. They have claimed through their advertising and promotion that the use of handguns increases one's self-protection of home and person, using slogans such as "homeowner's insurance," "tip the odds in your favor," "your safest choice for personal protection," and having a "good night." The defendants have placed such false and misleading advertisements and promotions, knowing that statistics show, and in wilful disregard of such statistics, that handguns actually increase the risk of harm to their owners and their families, in that: one out of three handguns is kept loaded and unlocked in the home; guns kept in the home for protection are twenty-two times more likely to kill or injure someone known by the owner, rather than an intruder; a gun actually is used for protection in fewer than 2 percent of home invasion crimes when someone is home; the risk of homicide in the home is three times greater in households with guns than households without guns, and the risk of suicide is five times greater; in 60 percent of fatal gun accidents, the weapon was located in or near the home; and more than 1.2 million elementary school aged children have access to guns in their homes. In addition, the defendants have placed false and misleading advertisements to lead consumers to believe that having a loaded handgun by the bedside is safe.

Under the subheading, "Irresponsible Handgun Sales," the plaintiffs alleged as follows. Many of the handgun retailers in and around Bridgeport and this state have sold handguns irresponsibly, in the following ways: they have sold large numbers of handguns to individual buyers, and permitted "straw" purchases when they knew or should have known that the handguns were intended for an unauthorized user. These sales provide a significant source of handguns used for

criminal activity in Bridgeport. In addition, the manufacturers are aware of the retailers' irresponsible and illegal conduct, and have not taken sufficient measures, if any, to prevent it.

The easy availability of handguns for the illegal market is a national problem. They are the most common instrumentality used in homicides nationwide. They were used in 69 percent of all homicides in 1995, and 68 percent in 1996. They cause approximately 34,000 deaths per year. The high level of gun violence has had a drastic impact on young persons. Between 1985 and 1994, the firearms death rate of juveniles increased 104 percent. From 1987 to 1989, the rate of increase more than doubled. In 1990, 82 percent of homicides of persons aged fifteen through nineteen were committed with handguns.

Under the subheading, "Dangerous Propensity of Handguns," the plaintiffs alleged the following. According to the nation's medical community, the gun problem is a major public health problem. Medical costs resulting from the treatment of gunshot victims cost taxpayers, including those in Bridgeport, $4.5 billion per year. The dangers of guns in the home and the consequences of their widespread availability have long been known to the defendants. Recent national surveys indicate that: 17 percent of adolescents, 29 percent of tenth grade boys, and 23 percent of seventh grade boys, have carried concealed handguns at one time; 70 percent of incarcerated prisoners feel that they easily could obtain firearms upon their release, 54 percent said they would obtain a firearm from the illegal street trade if they wanted one; 41 percent of high school students believe that they easily could obtain a handgun, and 37 percent would obtain one from the illegal street trade if they wanted one; 16.7 percent of Connecticut high school students, including those in Bridgeport, had carried a weapon to school in the month preceding the

survey; and 45 percent of arrestees obtained their guns in the illegal firearms market.

In addition, many of the handguns in the illegal market that are recovered by Bridgeport law enforcement have been used in the commission of crimes in Bridgeport, causing deaths, injuries and fear among its residents. More than 95 percent of firearms used in crimes in Bridgeport are handguns, which especially are attractive to criminals because they easily can be obtained and concealed. Many handguns are not recovered by law enforcement because they are either destroyed or hidden by the criminal perpetrator. Handguns used illegally in Bridgeport tend to be purchased recently, locally and in relatively new condition.

Against the background of these allegations, the plaintiffs' complaint sets forth nine substantive counts that incorporate the allegations. Each count contains the general allegation that, as a direct and proximate cause of the defendants' illegal conduct, Bridgeport has suffered damages.

The first count is a claim under the Product Liability Act. See footnote 5 of this opinion. The plaintiffs allege that a handgun is a product under the Product Liability Act. Under the subheading, "Failure To Include Safety Devices," they alleged further that the defendants negligently designed, manufactured and marketed their handguns, in that they failed to include safety devices or designs that they knew or should have known were readily available, including devices that would prevent the guns from being fired by unauthorized and unintended users by way of self-locking features and other similar methods, would alert users that a round was in the chamber, and would prevent the handguns from being used when the magazine was removed. They also alleged that the defendants knew or should have known that: their negligent designs would cause Bridgeport

injuries; given the gravity of the injuries suffered by the residents of Bridgeport, it was feasible for them to include safety designs; and, including safety devices would have prevented or reduced damages to Bridgeport.

Under the subheading, "Lack of Adequate Warnings," the plaintiffs alleged as follows. The defendants negligently failed to provide adequate warnings or instructions regarding the dangerousness of their handguns, including the lack of adequate warnings or instructions to owners: regarding the risks that minors could gain access to guns; on the proper storage and use of handguns; that a round may be hidden in the gun's chamber; and that the guns could be fired even with the magazine removed, and the attendant risks that thereby occur. The plaintiffs further alleged that the defendants actively promoted and advertised their handguns in a manner that failed to alert customers and potential customers to the risks of handguns and that, in fact, suggested that by purchasing handguns for their households they would become more safe, that the guns' designs were safe, and that families safely could store handguns in an unlocked manner accessible to minors. Thus, the plaintiffs alleged, the defendants' handguns were negligently designed, manufactured and marketed.

The second count is a claim for unfair and deceptive advertising under CUTPA. See footnote 4 of this opinion. The plaintiffs alleged that each defendant is a person engaged in the conduct of trade or commerce within the meaning of CUTPA. They also alleged as follows. The defendants have engaged in unfair and deceptive advertising and marketing in that they have: marketed and sold their handguns in a manner that causes harm to individuals, especially young children in Bridgeport; marketed and sold their handguns in a manner that contributes to homicides, suicides and accidental

deaths in Bridgeport; and engaged in a campaign of misrepresentation concerning the dangers of their handguns by falsely advertising that ownership of guns will increase home safety, knowing or having reason to know that ownership of guns in the home increases the risk of homicides, suicides and accidental injuries and deaths in the home. The plaintiffs also alleged that the defendants' false and misleading actions constitute unfair or deceptive practices in violation of General Statutes § 42-110b (a); see footnote 4 of this opinion; and are immoral, unethical, oppressive and unscrupulous, and in violation of public policy, causing substantial injury to consumers and others. The plaintiffs alleged further that, as a result of the defendants' conduct: the ability of many consumers to obtain and evaluate material information about purchasing handguns in Bridgeport has been limited; numerous Bridgeport residents have suffered and will suffer ascertainable losses, including death or serious bodily injury, resulting in substantial costs to Bridgeport; the defendants have reaped millions of dollars in ill-gotten profits in Bridgeport, which they should be required to disgorge and repay; and children, adolescents, felons, mentally unstable persons, and other unauthorized users of handguns have had easy access to handguns, have used them, have been encouraged by the defendants to use them, and the defendants have facilitated their opportunity to do so.

The third count is a claim for unfair and deceptive sales practices under CUTPA. The plaintiffs allege that the defendants have engaged in unfair and deceptive sales practices in that they: sell excessive numbers of guns to individual buyers, knowing or having reason to know that some or all of those guns are not for personal use, and are likely to be resold illegally and used to commit crimes; and sell guns that fail to incorporate feasible safety devices that would prevent misuse by

unauthorized and unintended users. The plaintiffs allege that these practices are immoral, unethical, oppressive and unscrupulous, and are in violation of public policy. The plaintiffs then repeat the same allegations of the results of the defendants' conduct that they made in the second count.

The fourth count is a count in common-law public nuisance. The plaintiffs alleged that the defendants unlawfully have participated in and contributed to the illegal flow of handguns into Bridgeport, which has a natural tendency to create a dangerous condition in Bridgeport, to injure its citizens and damage their property.

The plaintiffs alleged that the retailers continue to sell handguns to persons who they know or have reason to know are "straw purchasers" who illegally resell the handguns to persons unauthorized to purchase them under federal and state regulations. The retailers also continue to make multiple sales of handguns under circumstances that the retailers know or should know will result in illegal transfers and sales of the guns. This conduct of the retailers contributes to the physical harm, fear and inconvenience of Bridgeport residents and is injurious to their public health and safety.

The plaintiffs alleged that the manufacturers knew or should have known that they sold handguns that frequently are used in crimes, but failed to make meaningful efforts to impose standards on the distribution practices of either wholesalers or retailers who channel the flow of their handguns to the public in Bridgeport. In addition, the manufacturers: exploit the criminal market by targeting their advertising to persons who they know or should know will use the guns illegally; and fail to impose standards on retailers, despite knowing or foreseeing that they will sell the guns to persons who will use them to commit crimes, because to do

so would thereby reduce sales and their profits. The plaintiffs alleged further that the flow of handguns into Bridgeport inflicts continuing injury on the city, and that an illegally possessed handgun can be deemed a public nuisance under General Statutes § 54-33g,[7] and is subject to seizure and destruction.

[7] General Statutes § 54-33g provides: "(a) When any property believed to be possessed, controlled, designed or intended for use or which is or has been used or which may be used as a means of committing any criminal offense, except a violation of section 21a-267, 21a-277, 21a-278 or 21a-279, has been seized as a result of a lawful arrest or lawful search, which the state claims to be a nuisance and desires to have destroyed or disposed of in accordance with the provisions of this section, the judge or court issuing the warrant or before whom the arrested person is to be arraigned shall, within ten days after such seizure, cause to be left with the owner of, and with any person claiming of record a bona fide mortgage, assignment of lease or rent, lien or security interest in, the property so seized, or at his usual place of abode, if he is known, or, if unknown, at the place where the property was seized, a summons notifying the owner and any such other person claiming such interest and all others whom it may concern to appear before such judge or court, at a place and time named in such notice, which shall be not less than six nor more than twelve days after the service thereof. Such summons may be signed by a clerk of the court or his assistant and service may be made by a local or state police officer. It shall describe such property with reasonable certainty and state when and where and why the same was seized.

"(b) If the owner of such property or any person claiming any interest in the same appears, he shall be made a party defendant in such case. Any state's attorney or assistant state's attorney may appear and prosecute such complaint and shall have the burden of proving all material facts by clear and convincing evidence.

"(c) If the judge or court finds the allegations made in such complaint to be true and that the property has been possessed, controlled or designed for use, or is or has been or is intended to be used, with intent to violate or in violation of any of the criminal laws of this state, except a violation of section 21a-267, 21a-277, 21a-278 or 21a-279, he shall render judgment that such property is a nuisance and order the same to be destroyed or disposed of to a charitable or educational institution or to a governmental agency or institution provided, if any such property is subject to a bona fide mortgage, assignment of lease or rent, lien or security interest, such property shall not be so destroyed or disposed of in violation of the rights of the holder of such interest. When any money or valuable prize has been seized upon such warrant and condemned under the provisions of this section, such money or valuable prize shall become the property of the state and when the property is money it shall be deposited in the General Fund,

The plaintiffs also alleged that the defendants unreasonably use land, including retail stores and the streets of Bridgeport, for the purpose of marketing and selling handguns to persons whom the defendants know or should know would resell the handguns into the illegal handgun market, causing hundreds of handguns to be possessed illegally in Bridgeport. In addition, the defendants' conduct has an ongoing detrimental effect on Bridgeport's public health, safety and welfare, and on the public's ability to be free from disturbance and apprehension of danger to person and property.

The plaintiffs alleged that the existence of the nuisance is a proximate cause of injuries and damages suffered by Bridgeport, namely, that the presence of illegal guns in the city causes costs of enforcing the law, arming the police force, treating the victims of handgun crimes, implementing social service programs, and improving the social and economic climate of Bridgeport. The plaintiffs allege that preventing the flow

provided any such property, which at the time of such order is subject to a bona fide mortgage, assignment of lease or rent, lien or security interest shall remain subject to such mortgage, assignment of lease or rent, lien or security interest. When any property or valuable prize has been declared a nuisance and condemned under this section, the court may also order that such property be sold by sale at public auction in which case the proceeds shall become the property of the state and shall be deposited in the General Fund; provided, any person who has a bona fide mortgage, assignment of lease or rent, lien or security interest shall have the same right to the proceeds as he had in the property prior to sale. Final destruction or disposal of such property shall not be made until any criminal trial in which such property might be used as evidence has been completed.

"(d) If the judge or court finds the allegations not to be true or that the property has not been kept with intent to violate or in violation of the criminal laws of this state or that it is the property of a person not a defendant, he shall order the property returned to the owner forthwith and the party in possession of such property pending such determination shall be responsible and personally liable for such property from the time of seizure and shall immediately comply with such order.

"(e) Failure of the state to proceed against such property in accordance with the provisions of this section shall not prevent the use of such property as evidence in any criminal trial."

of illegal handguns into the illegal market will help save lives, prevent injuries and make Bridgeport a safer place in which to live and work. Finally, the plaintiffs allege that the public nuisance created by the defendants' conduct, if unabated, will continue to threaten the health, safety and welfare of the residents of Bridgeport, creating an atmosphere of fear that adversely affects the residents' sense of well-being and safety.

The fifth count is based on general allegations of negligence in design, manufacture and marketing. The plaintiffs alleged that the defendants knew or should have known of the likelihood that their negligent designs would cause injuries to Bridgeport, and that the injuries suffered by Bridgeport would greatly out-weigh the burden on the manufacturers of including safety devices, and that the gravity of injuries would outweigh any adverse effect on the legitimate utility of handguns. The plaintiffs further alleged that an alterna-tive design incorporating readily available safety fea-tures would have reduced, if not prevented, the injuries suffered by the residents of Bridgeport, its police force, emergency services, health and human services, courts, prisons and other agencies and services that Bridge-port represents.

The plaintiffs alleged that the defendants failed to give the following warnings and instructions to owners of handguns: warnings of the risks that minors could gain access to them, that a round may be hidden in the chamber, and that the handguns could be fired even with the ammunition magazine removed; and instruc-tions on the proper storage and use of weapons. In addition, the plaintiffs alleged that the defendants advertised their handguns in a manner that failed to alert customers, potential customers and retailers to the risks of handguns, and that suggested that customers would be made more safe in their households, and that families safely could store handguns unlocked and

accessible to minors. Finally, the plaintiffs alleged that the defendants owed and had breached a continuing duty to Bridgeport not to manufacture, market and sell handguns that lacked appropriate safety devices or suitable warnings or instructions.

The sixth count is based specifically on the alleged negligent production, marketing and distribution of handguns. The plaintiffs alleged that an illegal market in handguns has pervaded the nation, including Bridgeport, that the defendants participate in the national handgun market, and that they reasonably should have expected that their manufacture and distribution of handguns would have consequences throughout the nation, including Bridgeport.

The plaintiffs alleged further that the defendants have manufactured and distributed more handguns throughout the nation than they reasonably could expect to be acquired legally by authorized persons, that they have done so without adequate supervision and regulation, that their manufacturing and distribution practices have been unreasonably unsafe, and that by doing so the defendants are creating, maintaining and supplying the illegal market in handguns. The plaintiffs also alleged that the defendants have done so in order to increase their sales and profits, and that they knew or should have known that unauthorized persons, including children under the age of twenty-one, have been acquiring handguns through the illegal handgun market.

The plaintiffs also alleged that the defendants owed the public, including Bridgeport, a duty not to manufacture and distribute handguns so as to supply and enhance the illegal market. The defendants have breached this duty by negligently: manufacturing, marketing and distributing handguns without adequate supervision and controls; oversupplying the lawful market in handguns; manufacturing, marketing and distrib-

uting handguns in such a way that it reasonably was foreseeable that they would be acquired by unauthorized persons, including children under twenty-one, and by failing to take reasonable steps to ensure that this did not happen; failing to implement reasonable controls on the distribution of handguns; marketing, and permitting the marketing of, handguns in such a way that they would be acquired by unauthorized persons, including children incapable of appreciating their dangers; failing to screen and investigate the background and business practices of the distributors and retailers; failing to keep reasonable records of handgun sales and transfers; and failing to conduct reasonable examinations of the records of the distributors and retailers to determine that their handguns were not being illegally sold and trafficked. As a result, the plaintiffs alleged, persons under twenty-one, criminals and others have acquired and used the defendants' handguns.

The seventh count is based on a civil conspiracy. The plaintiffs alleged that the defendants have conspired, among themselves and others to commit unlawful acts, including violating the products liability act and CUTPA, creating a public nuisance, and aiding and abetting the illegal sale of handguns by: failing to develop and implement means that would prevent their handguns from being fired by unauthorized and unintended persons, and discouraging the development of such means; failing to develop and implement other safety features; failing to develop ways of preventing their handguns from entering the illegal market and ultimately being used to commit crimes; and failing to issue adequate warnings alerting handgun users to the risks of handguns and the importance of their proper storage.

The eighth count alleged a civil conspiracy among retailers and dealers. The plaintiffs alleged that these defendants have conspired with the criminal element of the buying public to commit unlawful acts by: selling

handguns to persons who they knew or should have known will illegally resell them in the illegal market; making repeated sales of handguns to one individual under circumstances where the defendants knew or should have known that the handguns were to be illegally resold; and selling handguns to Bridgeport residents when the buyers' conduct indicated that the buyer intended to resell them illegally. The plaintiffs further alleged that these defendants consciously assisted and failed to prevent the illegal flow of handguns, and instead chose to profit therefrom. The plaintiffs alleged further that the defendants violated their duty to Bridgeport and its residents to comply with the letter and spirit of governing laws and to implement controls to prevent the illegal flow of handguns.

The ninth and final count alleged unjust enrichment. The plaintiffs alleged that the defendants have reaped enormous profits from the sale of handguns in and around Bridgeport. The plaintiffs alleged further that these sales have resulted in enormous increases in Bridgeport's expenditures in the areas of: medical care; police investigation; emergency personnel; public health resources; human services; courts; prisons; sheriffs; and related expenditures. In addition, Bridgeport has been impacted negatively by the defendants' handgun sales due to: decreases in property values throughout Bridgeport; loss of businesses; difficulty in redeveloping Bridgeport; and loss of substantial tax revenues due to lost productivity.

The plaintiffs further alleged that the defendants engaged in this course of wrongful conduct for the purpose of increasing their profits, while at the same time avoiding responsibility for Bridgeport's costs for medical care and criminal investigations caused by such sales and use of handguns. As a result, Bridgeport has been required to pay for costs associated with the defendants' unlawful conduct. Thus, the plaintiffs alleged,

the defendants unjustly have been enriched at Bridgeport's expense.

The plaintiffs requested monetary and injunctive relief. They sought: (1) compensatory and punitive damages, including attorney's fees; (2) an injunction prohibiting the defendants from continuing to distribute handguns without appropriate safety devices and warnings, and from using unfair or deceptive advertising and sales practices; and (3) an injunction requiring the defendant manufacturers and retail sellers: (a) to create and implement standards to eliminate or reduce substantially the illegal secondary handgun market in Bridgeport and elsewhere; (b) to provide adequate warnings regarding the risk associated with handguns, and the proper storage of them; (c) to fund studies and programs focused on handgun safety and owner responsibility; and (d) to fund studies and programs focused on handgun safety and owner responsibility, and with the goal of reducing handgun violence.

## II

### THE LIMITS OF THIS APPEAL

We first specify what this appeal does not involve, and what it does involve. It does not involve the question of whether, as a matter of public policy, handguns ought to be subject to greater controls than those to which they currently are subject, at either the state or federal level. Further, it does not involve the degree, if any, to which such controls might in any given case violate, or be consistent with, either a state or federal constitutional right to bear arms. Finally, it does not involve the question of whether the plaintiffs, in making the allegations that they have made against the defendants, have stated any cause of action against the defendants.

This appeal involves only the question of whether the plaintiffs have standing to assert the claims against

the defendants that they have asserted, taking their factual allegations as true. In this connection, however, we note that the plaintiffs do not make any claim on behalf of the residents of Bridgeport, as parens patrie or in some other similar representative capacity. The plaintiffs' claims, instead, specifically are bottomed on harms that they claim result directly to them—the city of Bridgeport, and Ganim as its mayor—from the defendants' conduct. These claimed harms, moreover, do not involve injuries such as physical damage to municipal personal or real property resulting from the use of handguns by any particular individuals. Instead, as is delineated more precisely in part III of this opinion, the harms claimed involve more pervasive and general harms to the municipal polity. With this background in mind, we turn to the plaintiffs' claims on appeal.

## III

## DIRECTNESS OR REMOTENESS OF THE CLAIMED INJURIES

We first consider the claim of the plaintiffs that they have standing because the harms that they have alleged are direct as to them and are not remote, indirect or derivative of other persons' or entities' harms, and the defendants' claim to the contrary that the plaintiffs lack standing because the harms that they claim to suffer are too remote, indirect and derivative with respect to the defendants' alleged conduct.[8] We agree with the defendants.

It is necessary first to describe with some particularity the harms to Bridgeport that the plaintiffs claim, based on the antecedent conduct of the defendants. A fair and thorough reading of the complaint discloses that the harms claimed by the plaintiffs may be summa-

---

[8] We address these competing claims first because they are dispositive of many of the underlying issues in this appeal.

rized as follows. As a result of the defendants' conduct, Bridgeport has incurred increased expenses for police services, including courts, prisons and related services, emergency services, pension benefits, health care and social services, and has been required to impose related increased tax burdens on Bridgeport taxpayers. Other harms claimed are reduced property values, and loss of investment, economic development and tax revenues due to lost productivity in Bridgeport. In addition, the plaintiffs claim the harm of victimization of Bridgeport's citizens, particularly its children, who are injured or killed by handguns, including injuries by assault, and deaths by homicide and suicide. Related harms claimed are high levels of violent crime in Bridgeport, destroying families and communities therein, particularly the minority communities, and a negative impact on the lifestyle of children in certain residential communities in Bridgeport. Finally, and in more general terms, the plaintiffs claim the harms of a detrimental effect on the public health, safety and welfare of the residents of Bridgeport, and on their ability to be free from disturbance and apprehension of danger.

The conduct of the defendants causing these harms may be fairly summarized as follows. The manufacturers have failed to design handguns so as to prevent unauthorized and unintended users, including criminals, adolescents and children, from using them, and have promoted and distributed them without warnings that would prevent such users from shooting them. In addition, they have conspired to and have advertised falsely that the use of handguns will increase the safety of the home and person, and have sold guns in a manner that leads to guns flowing into an illegal market that supplies them to such unauthorized users in Bridgeport. The manufacturers also have failed to screen the background and business practices of the distributors and retailers of handguns. Similarly, the retailers sell and

advertise handguns that are fired by such unauthorized and intended users in Bridgeport. Furthermore, the defendants have manufactured, marketed and distributed the handguns without adequate instructions regarding their proper use and storage, and without adequate warnings to all foreseeable users, including such unauthorized and unintended users, that they may be fired although they appear to be unloaded and even with the magazine removed. The defendants also have marketed the handguns in a manner that suggested that they did not pose risks to users and their households, and that encouraged unsafe storage practices. Moreover, the defendants failed to determine whether safety devices were feasible or effective, and failed to inform customers of safety devices that would decrease or prevent the dangers of handguns. Further, the defendants knew or should have known that their handguns would fall into the hands of such unauthorized and unintended users, and would be used in unpreventable shootings by such users in Bridgeport. Finally, the retailers have sold handguns in such numbers and in such ways that they knew or should have known that the guns were intended for unauthorized and unintended users, providing a significant source of the criminal use of handguns in Bridgeport.

It is axiomatic that a party must have standing to assert a claim in order for the court to have subject matter jurisdiction over the claim. *Ramos* v. *Vernon*, 254 Conn. 799, 808, 761 A.2d 705 (2000). Our standing jurisprudence consistently has embodied the notion that there must be a colorable claim of a direct injury to the plaintiff, in an individual or representative capacity.[9] Id., 809; *Maloney* v. *Pac*, 183 Conn. 313, 321, 439 A.2d

[9] As we noted in part II of this opinion, the plaintiffs do not claim to have standing in any representative capacity. Their complaint, as well as their arguments on appeal, are confined to a claim that they, as the municipality, are directly harmed by the defendants' conduct.

349 (1981); see also *Community Collaborative of Bridgeport, Inc.* v. *Ganim*, 241 Conn. 546, 553–54, 698 A.2d 245 (1997); *Gay & Lesbian Law Students Assn.* v. *Board of Trustees*, 236 Conn. 453, 463–64, 673 A.2d 484 (1996); *Monroe* v. *Horwitch*, 215 Conn. 469, 473, 576 A.2d 1280 (1990); *Malerba* v. *Cessna Aircraft Co.*, 210 Conn. 189, 192, 554 A.2d 287 (1989).

The requirement of directness between the injuries claimed by the plaintiff and the conduct of the defendant also is expressed, in our standing jurisprudence, by the focus on whether the plaintiff is the proper party to assert the claim at issue. In order for a plaintiff to have standing, it "must be a proper party to request adjudication of the issues." (Internal quotation marks omitted.) *Community Collaborative of Bridgeport, Inc.* v. *Ganim*, supra, 241 Conn. 553. "Standing focuses on whether a party is the proper party to request adjudication of the issues, rather than on the substantive rights of the aggrieved parties. *Nye* v. *Marcus*, [198 Conn. 138, 141, 502 A.2d 869 (1985)]. It is a basic principle of law that a plaintiff must have standing for the court to have jurisdiction. Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. *Ardmare Construction Co.* v. *Freedman*, 191 Conn. 497, 501, 467 A.2d 674 (1983) . . . ." (Citation omitted; internal quotation marks omitted.) *Weidenbacher* v. *Duclos*, 234 Conn. 51, 61–62, 661 A.2d 988 (1995).

Thus, to state these basic propositions another way, if the injuries claimed by the plaintiff are remote, indirect or derivative with respect to the defendant's conduct, the plaintiff is not the proper party to assert them and lacks standing to do so. Where, for example, the harms asserted to have been suffered directly by a plain-

tiff are in reality derivative of injuries to a third party, the injuries are not direct but are indirect, and the plaintiff has no standing to assert them. *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, 191 F.3d 229, 238–39 (2d Cir. 1999), cert. denied, 528 U.S. 1080, 120 S. Ct. 799, 145 L. Ed. 2d 673 (2000).

Moreover, the doctrine that one may not sue for injuries only indirectly caused by a defendant's conduct has deep roots in our common law. As early as 1856, this court held that a life insurer who had paid benefits for the life of its insured could not sue the railroad that negligently had caused the insured's death because, despite the factual connection between the defendant's conduct and the plaintiff's loss, the loss was indirect, rather than direct. *Connecticut Mutual Life Ins. Co.* v. *New York & N. H. R. Co.*, 25 Conn. 265, 274–75 (1856); see also *Anthony* v. *Slaid*, 52 Mass. (11 Met.) 290, 291 (1846) (plaintiff who had contracted to support town's paupers could not sue person who had assaulted pauper for increased medical expenses paid by plaintiff; suit "too remote and indirect").

The task of the court in a case such as this is to determine whether the facts, as stated in the complaint and taken as true, demonstrate that the injuries, on one hand, are direct or, on the other hand, are indirect, remote or derivative. In doing so, however, we are not constrained by the parties' characterizations of them as direct or indirect, because whether a party has standing, based upon a given set of facts, is a question of law for the court; *Connecticut Associated Builders & Contractors* v. *Anson*, 251 Conn. 202, 209, 740 A.2d 804 (1999); and in this respect the labels placed on the allegations by the parties is not controlling. See, e.g., *Allard* v. *Liberty Oil Equipment Co.*, 253 Conn. 787, 800, 756 A.2d 237 (2000) ("[defendant] cannot . . . convert its apportionment claim against [third party defendant]

into something other than a product liability claim simply by alleging only negligent misconduct").

The question of whether a set of harms suffered by the plaintiff is the direct, or the indirect, remote or derivative, consequence of the defendant's conduct, is not determined, however, simply by the court applying one set of labels or the other to the facts of the case. It is, instead, part of the judicial task, based on policy considerations, of setting some reasonable limits on the legal consequences of wrongful conduct. In this respect, it is akin to, if not precisely the same as, the judicial task of determining whether a tortfeasor owes a duty to one who has been injured, albeit indirectly, by the tortfeasor's conduct. In that respect, we have stated: "[W]e recognize that duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection. W. Prosser & W. Keeton, [Torts (5th Ed. 1984)] § 53, p. 358. While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world. Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree. . . . *Maloney* v. *Conroy*, [208 Conn. 392, 401–402, 545 A.2d 1059 (1988)]. The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results. W. Prosser & W. Keeton, supra, § 43, p. 281." (Internal quotation marks omitted.) *RK Constructors, Inc.* v. *Fusco Corp.*, 231 Conn. 381, 386, 650 A.2d 153 (1994).

The same is true of the question of directness, as opposed to indirectness, remoteness and derivative injury, in the standing context. Indeed, in federal standing jurisprudence, the courts have considered the ques-

tions of proximate cause—which we ordinarily analyze under the concept of duty—and standing as part and parcel of the same inquiry. "Here we use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.' [W. Prosser & W. Keeton, supra, § 41, p. 264]. Accordingly, among the many shapes this concept took at common law, see [*Associated General Contractors of California, Inc.* v. *California State Council of Carpenters*, 459 U.S. 519, 532–33, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)], was a demand for some direct relation between the injury asserted and the injurious conduct alleged. Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover. See, e.g., 1 J. Sutherland, Law of Damages 55–56 (1882)." *Holmes* v. *Securities Investor Protection Corp.*, 503 U.S. 258, 268–69, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992); see id., 286–87 (Scalia, J., concurring) ("[t]he ultimate question here is statutory standing: whether the so-called *nexus* [mandatory legalese for 'connection'] between the harm of which this plaintiff complains and the defendant's so-called predicate acts is of the sort that will support an action under civil [Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq.]" [emphasis in original]); *Associated General Contractors of California, Inc.* v. *California State Council of Carpenters*, supra, 535–36.

"In everyday terms, the concept might be explained as follows: Because the consequences of an act go endlessly forward in time and its causes stretch back to the dawn of human history, proximate cause is used essentially as a legal tool for limiting a wrongdoer's

liability only to those harms that have a reasonable connection to his actions. The law has wisely determined that it is futile to trace the consequences of a wrongdoer's action to their ultimate end, if end there is." *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.,* supra, 191 F.3d 235.

We are persuaded by the analysis of standing employed by the United States Court of Appeals for the Second Circuit in *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.,* supra, 191 F.3d 235, drawn from the decision of the United States Supreme Court in *Holmes* v. *Securities Investor Protection Corp.,* supra, 503 U.S. 268. In *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.,* supra, 232–33, the plaintiff labor union health and welfare funds sued the defendant major tobacco companies alleging a conspiracy to deceive the public generally, and the plaintiffs specifically, regarding the health risks of smoking in order to shift the health related costs of smoking to the plaintiffs.[10] The Court of Appeals held that the financial harms alleged by the plaintiffs were remote, derivative and indirect and, therefore, that the plaintiffs lacked standing to sue. Id., 239.[11]

---

[10] Specifically, the plaintiffs alleged that the defendants for decades had engaged in an advertising campaign to mislead the plaintiffs regarding the true extent of the health dangers of smoking, and actively concealed information regarding the actual health risks and addictiveness of nicotine, as a result of which thousands of participants in the plaintiffs' funds became ill and died, and the plaintiffs spent tens of millions of dollars to provide medical services for those participants. *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.,* supra, 191 F.3d 232–33.

[11] All of the other federal Courts of Appeals that have considered similar questions consistently have held with the Second Circuit Court of Appeals in *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.,* supra, 191 F.3d 239, that health insurers or health plans lacked standing to sue tobacco manufacturers for increased costs of medical care related to smoking on the grounds of remoteness. See *Texas Carpenters Health Benefit Fund* v. *Philip Morris, Inc.,* 199 F.3d 788, 789–90 (5th Cir. 2000) (federal RICO and antitrust claims barred); *International Brotherhood of Teamsters, Local 734 Health & Welfare Trust Fund* v. *Philip Morris, Inc.,* 196 F.3d 818, 823–28 (7th Cir. 1999) (federal RICO claim and federal and state antitrust

The Court of Appeals in *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, supra, 191 F.3d 236–37, stated: "As Justice Holmes writing for the Court observed in *Southern Pac. Co.* v. *Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533, 38 S. Ct. 186, 62 L. Ed. 451 (1918), '[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.' Accord *Holmes* [v. *Securities Investor Protection Corp.*, supra, 503 U.S. 271–72] (quoting [*Associated General Contractors of California, Inc.* v. *California State Council of Carpenters*, supra, 459 U.S. 534]. For that reason, where a plaintiff complains of injuries that are wholly derivative of harm to a third party, plaintiff's injuries are generally deemed indirect and as a conse-

---

claims barred); *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, supra, 241, 243 (federal RICO claim and state common-law claims of fraudulent misrepresentation and breach of special duty barred); *Oregon Laborers-Employers Health & Welfare Trust Fund* v. *Philip Morris, Inc.*, 185 F.3d 957, 964, 968 (9th Cir. 1999), cert. denied, 528 U.S. 1075, 120 S. Ct. 789, 145 L. Ed. 2d 666 (2000) (federal and state RICO claims, federal and state antitrust claims, state Unfair Trade Practices Act claim, and state claim of fraudulent misrepresentation and concealment barred); *Coyne* v. *American Tobacco Co.*, 183 F.3d 488, 494–95 (6th Cir. 1999) (state law claims of breach of special duty, consumer fraud, restitution, unjust enrichment, civil conspiracy, violations of consumer protection statutes, breach of express warranty, breach of implied warranty, strict product liability, fraud and deceit, negligent misrepresentation and negligence barred); *Steamfitters Local Union No. 420 Welfare Fund* v. *Philip Morris, Inc.*, 171 F.3d 912, 934–37, 937 n.23 (3d Cir. 1999), cert. denied, 528 U.S. 1105, 120 S. Ct. 844, 145 L. Ed. 2d 713 (2000) (federal antitrust and RICO claims and state common-law claims of fraudulent misrepresentation, breach of special duty, unjust enrichment, negligence, strict liability and breach of warranty barred).

Indeed, that body of case law also supports the conclusion of lack of standing in the present case, where the connection between the defendants' conduct and the plaintiffs' claimed harms is more remote than in those cases, and where the other, independent potential causative factors are more numerous and pervasive than in those cases. The remoteness doctrine, as a necessary limitation on standing, also has been applied by other federal courts to other common-law and statutory claims. See, e.g., *New Jersey Carpenters Health Fund* v. *Philip Morris, Inc.*, 17 F. Sup. 2d 324, 329–32, 336–38, 340–41, 344 (D.N.J. 1998) (state law claim of fraud and federal RICO claim, both premised upon conduct directed at funds' participants, federal and state antitrust claims, and state law claims of unjust enrichment barred).

quence too remote, as a matter of law, to support recovery. See *Holmes* [v. *Securities Investor Protection Corp.*, supra, 268–69]. At the same time, the Supreme Court noted the impossibility of articulating a black-letter rule capable of dictating a result in every case. See id. [272 n.20]. Accordingly, it identified three policy factors to guide courts in their application of the general principle that plaintiffs with indirect injuries lack standing to sue . . . . See id. [269–70]. First, the more indirect an injury is, the more difficult it becomes to determine the amount of plaintiff's damages attributable to the wrongdoing as opposed to other, independent factors. Second, recognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of multiple recoveries. Third, struggling with the first two problems is unnecessary where there are directly injured parties who can remedy the harm without these attendant problems. See [id.]." Application of these principles to the facts of the present case leads us to conclude that the harms claimed by the plaintiffs are indirect, remote and derivative with respect to the defendants' conduct, and that, therefore, the plaintiffs lack standing to assert them.

We first note, as the defendants pointed out at oral argument before this court, the various links in the factual chain between the defendants' conduct and the harms suffered by the plaintiffs. The fundamental premises underlying the facts alleged by the plaintiffs are that, by virtue of various affirmative tortious acts and tortious failures to perform other acts, handguns either end up in the hands of unauthorized and unintended users who then misuse them in Bridgeport, or end up in the hands of authorized users who have been inade-

quately warned or positively misled as to their safety and dangers and who misuse them in Bridgeport.

Necessarily implicit in this factual scenario are the following links in the chain connecting the defendants' conduct to the plaintiffs. The manufacturers sell the handguns to distributors or wholesalers and, as the defendants point out and the plaintiffs do not contest, those sales are lawful because federal law requires that they be by licensed sellers to licensed buyers. The distributors then sell the handguns to the retailers, sales that, again, are required by federal law to be by licensed sellers to licensed buyers. The next set of links is that the retailer then sells the guns either to authorized buyers, namely, legitimate consumers, or, through the "straw man" method or other illegitimate means, to unauthorized buyers, sales that likely would be criminal under federal law. Next, the illegally acquired guns enter an "illegal market." From that market, those guns end up in the hands of unauthorized users. Next, either the authorized buyers misuse the guns by not taking proper storage precautions or other unwarned or uninstructed precautions, or the unauthorized buyers misuse the guns to commit crimes or other harmful acts. Depending on the nature of the conduct of the users of the guns, the plaintiffs then incur expenses for such municipal necessities as investigation of crime, emergency and medical services for the injured, or similar expenses. Finally, as a result of this chain of events, the plaintiffs ultimately suffer the harms delineated previously, namely, increased costs for various municipal services, increased tax burdens on Bridgeport taxpayers, reduced property values, loss of investments and economic development in the city, loss of tax revenues from lost productivity, injuries and deaths of Bridgeport's residents, destruction of families and communities in the city, and a negative impact on the lifestyle

of certain children in the city and on the ability of the residents to live free from apprehension of danger.

This description demonstrates several significant considerations. First, there are numerous steps between the conduct of the various defendants and the harms suffered by the plaintiffs. That fact alone is strongly suggestive of remoteness. See, e.g., *Steamfitters Local Union No. 420 Welfare Fund* v. *Philip Morris, Inc.*, 171 F.3d 912, 930 (3d Cir. 1999), cert. denied, 528 U.S. 1105, 120 S. Ct. 844, 145 L. Ed. 2d 713 (2000) (focusing on "sheer number of links in the chain of causation" between tobacco company's suppression of information and increased costs of health care by union fund, leading to conclusion of lack of standing). In addition, the harms suffered by the plaintiffs are derivative of those suffered by the various actors in between the defendants and the plaintiffs. For example, the plaintiffs would not suffer the harm of increased costs for various municipal services but for the fact that certain of the residents of Bridgeport had been the primary victims of the defendants' misfeasance. Without belaboring the obvious, for example, the increased medical costs are the costs imposed in the first instance on the victims of the handgun violence; the decreased tax revenues from lost productivity are the result of lost productivity on the part of otherwise productive residents who were such victims; the injuries resulting from the defendants' misleading advertising regarding the safety of lawfully possessed handguns are injuries to those persons who misused or improperly stored such guns as a result of such advertising; and the fear in which certain residents of Bridgeport are forced to live is the fear experienced by those residents. Much the same may be said of the other harms claimed by the plaintiffs.[12]

---

[12] To the extent that certain limited aspects of the claimed harms may be viewed as not strictly derivative of harms to others, as the plaintiffs suggest, we discuss those aspects later in this opinion.

Furthermore, the three part policy analysis articulated in *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, supra, 191 F.3d 229, supports the conclusion that the plaintiffs here lack standing. The first factor is that the more indirect an injury is, "the more difficult it becomes to determine the amount of plaintiff's damages attributable to the wrongdoing as opposed to other, independent factors." Id., 236–37. It cannot be denied that factors other than the defendants' manufacture, advertisement, distribution and retail sales of guns contribute in significant measure to the various harms claimed by the plaintiffs. The scourge of illegal drugs, poverty, illiteracy, inadequacies in the public educational system, the birth rates of unmarried teenagers, the disintegration of family relationships, the decades long trend of the middle class moving from city to suburb, the decades long movement of industry from the northeast "rust belt" to the south and southwest, the swings of the national and state economies, the upward track of health costs generally, both at a state and national level, unemployment, and even the construction of the national interstate highway system, to name a few, reasonably may be regarded as contributing to Bridgeport's increased crime rate, including crimes committed with handguns, and assault and suicide rates, increased costs of municipal services, reduced tax base, loss of investment and development, and injuries to the communities that make up Bridgeport and to its quality of urban life. It would require us to blink at reality to minimize the enormous difficulty to be encountered in attempting reliably to separate out the contribution of the defendants' conduct to those harms from these other, independent factors.[13] The diffi-

---

[13] The plaintiffs propose to prove their damages "through expert economic testimony, statistical modeling, and other evidence," presumably similar in its nature to statistical modeling. Indeed, it is difficult to conceive how the plaintiffs could prove what portions of the harms they claim are attributable to the defendants' conduct, as opposed to other, independent factors, without some form of sophisticated and complex statistical modeling evidence.

culty is even greater where, as in the present case, much

A similar proposition was presented to the court in *Steamfitters Local Union No. 420 Welfare Fund* v. *Philip Morris, Inc.*, supra, 171 F.3d 912, in which the plaintiff union health and welfare funds sought to hold the tobacco industry liable for their costs in covering their participants' smoking related illnesses. In holding that the plaintiffs' claims were too remote to confer standing, the Third Circuit Court of Appeals concluded that such a method of proving damages would be " 'highly speculative.' " Id., 929.

We are persuaded by the reasoning of that case. The Court of Appeals stated: "[T]he [plaintiffs'] damages claims are quite speculative (and very difficult to measure), implicating [*Associated General Contractors of California, Inc.*'s] fifth factor. The [plaintiffs] argue that damages may be easily calculated by aggregation and the application of statistical models. We question how easy this process would be. The [plaintiffs'] alleged damages are said to arise from the fact that the tobacco companies prevented the [plaintiffs] from providing smoking-cessation or safer smoking information to their participants, some of whom would have allegedly quit smoking or begun smoking safer products, reducing their smoking-related illnesses, and thereby lowering the [plaintiffs'] costs for reimbursing smokers' health care expenditures. In order to calculate the damages—i.e., the costs not lowered due to the antitrust conspiracy—the [plaintiffs] must demonstrate how many smokers would have stopped smoking if provided with smoking-cessation information, how many would have begun smoking less dangerous products, how much healthier these smokers would have been if they had taken these actions, and the savings the [plaintiffs] would have realized by paying out fewer claims for smoking-related illnesses.

"It is apparent why the [plaintiffs] argue that they can demonstrate all of this through aggregation and statistical modeling: it would be impossible for them to do so otherwise. Cf. *Barnes* v. *American Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998) [cert. denied, 526 U.S. 1114, 119 S. Ct. 1760, 143 L. Ed. 2d 791 (1999)] (affirming denial of class certification in statewide smokers' suit, because 'addiction, causation, the defenses of comparative and contributory negligence, the need for medical monitoring and the statute of limitations present too many individual issues to permit certification'). Yet we do not believe that aggregation and statistical modeling are sufficient to get the [plaintiffs] over the hurdle of the [*Associated General Contractors of California, Inc.*] factor focusing on whether the 'damages claim is . . . highly speculative.' [*Associated General Contractors of California, Inc.* v. *California State Council of Carpenters*, supra, 459 U.S. 542].

"In some litigation contexts, there is a meaningful distinction between damages that are completely incapable of determination and those that are difficult to determine but are nonetheless measurable. In those contexts, if the latter is the case, aggregation and statistical modeling may be appropriate (though we need not decide that issue here) to allow plaintiffs to overcome the difficulty of proving the amount of damages. Cf. *Hilao* v. *Estate of Marcos*, 103 F.3d 767, 782–87 (9th Cir. 1996) (allowing use of aggregation

of the defendants' misconduct constitutes claimed failures to meet certain duties and obligations, such as the duties to warn and instruct, and the attendant failures to act by the primary victims of those breaches of duty. Reliably ascertaining what the state of affairs would have been had those obligations been performed, and what those victims would have done had those warnings and instructions been given, in a case in which those individuals are not before the court, complicates the calculus of attributable damages even more. See id., 240 (It is difficult to speculate "what damages [claimed from smokers' fraudulently induced inaction] arose from a party's failure to act. In [that] situation . . . it becomes difficult to distinguish among the multitude of factors that might have affected the damages.").

The second factor is that "recognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of multiple recoveries."

and statistical analysis to determine compensatory damages). But cf. *Arch v. American Tobacco Co.*, 175 F.R.D. 469, 493 (E.D. Pa. 1997) (rejecting use of statistical evidence to overcome need to prove individual damages in putative class action). In the present context, however, a finding of antitrust standing must precede a finding of liability, which itself precedes the assessment of damages. Therefore, the fact that 'once liability is established, plaintiff's proof of damages will be evaluated under a more lenient standard,' *Danny Kresky Enters. v. Magid*, 716 F.2d 206, 212 (3d Cir. 1983), does not eliminate from our analysis of the [*Associated General Contractors of California, Inc.*] factors the speculative (though potentially measurable) nature of plaintiffs' damages. This speculativeness strongly militates against plaintiffs' position." *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, supra, 171 F.3d 928–29.

In the present case, the length of the potential causative chain is at least as long as, if not longer than, the chain in *Steamfitters Local Union No. 420 Welfare Fund*. Furthermore, the number of potential other causes in the present case exceeds those set forth in that case. Thus, the plaintiffs' proposed method of proving their damages is simply too speculative to overcome the first factor set forth in *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, supra, 191 F.3d 236–37.

Id., 237. In the present case, the harm suffered by the potential other plaintiffs, which include all of the primary victims mentioned previously, exists at a level less removed from the alleged actions of the defendants. They include, for example, all the homeowners in Bridgeport who have been deceived by the defendants' misleading advertising, all of the persons who have been assaulted or killed by the misuse of the handguns, and all of the families of the persons who committed suicide using those handguns. How, precisely or generally, the damages suffered by these groups of potential plaintiffs would be apportioned with respect to the damages sought by the plaintiffs in the present case, in order to avoid double recoveries and double liabilities for the same losses, would present a daunting question to any court. In addition, in suits by those other potential plaintiffs, the defendants would be entitled to assert various special defenses, based on those plaintiffs' conduct, which would not be available to the defendants in the present action. Thus, failing to recognize the derivative nature of the present action could unfairly deprive the defendants of those defenses.

The third factor is that "struggling with the first two problems is unnecessary where there are directly injured parties who can remedy the harm without these attendant problems." Id. We already have identified some of the directly injured parties who could presumably, without the attendant problems referred to, remedy the harms directly caused by the defendants' conduct and thereby obtain compensation, and deter the defendants from continuing their tortious conduct, to the extent, at least, that tort law can accomplish that goal. Thus, the availability of such other remedies by other parties who are directly harmed greatly reduces the need for confronting the enormous difficulties in sorting out the questions of causation and damages demonstrated by the first two factors.

The plaintiffs contend that their claimed harms are not remote and derivative because, "[i]f the plaintiff would suffer harm to some degree regardless of another's injuries, its injury is not derivative." Thus, they argue, if they can "prove that [the] defendants caused only one dollar in damages, Bridgeport has the right to seek redress in court." The gist of this argument is that their injuries are not "derivative" because that limiting doctrine only applies where the "alleged injuries derived solely and entirely from, and would not have existed at all without, the personal injuries suffered by individual" victims. They claim, therefore, that they have standing because there are instances where the injuries for which they seek redress occur even without an individual victim, for example, where they incur the costs of detection, investigation, arrest and social services "handling cases of unlawful gun possession in which not a single shot is fired." We are not persuaded.

First, this argument hardly reflects a fair and serious reading of their complaint. The necessary implication of that contention is that the plaintiffs' standing would be limited to those instances in which the financial and other injuries of which they complain were caused by what were in effect "victimless" handgun crimes. It is difficult, however, after considering the breadth and gravity of the allegations of the grievous sets of harms claimed by the plaintiffs in their complaint, to take seriously a contention that all they really claim standing for are those occasional instances in which the crimes caused by the defendants' conduct are victimless handgun crimes. What, then, of the killings, assaults, suicides, fears, accidental injuries, threats to the minority communities, and negative impacts on the lifestyles of children alleged in the complaint?

Second, we disagree with the plaintiffs' characterization of the remoteness and derivateness doctrine. Although the availability of remedies in other potential

plaintiffs is one factor in that calculus, it is not the only factor. Others are the simple length of the causation chain that the plaintiffs' claims entail, and the difficulties of potential proof that such a length necessarily involves. That length is present in much the same degree, regardless of whether the claimed harms result from crimes committed on others.

This leads to the third reason for our disagreement with the plaintiffs' contention. Taking that contention at face value—that their claim of standing may be narrowed to the victimless crimes—would make the first and third factors enumerated previously in *Laborers Local 17 Health & Benefit Fund* even more compelling. It would be even more difficult to separate out, from all of the other potential, independent causes of the harms claimed by the plaintiffs, not only the defendants' contribution to those harms in a general way, but specifically the defendants' contribution to those harms attributed only to instances in which guns did not involve any primary victims. Thus, the first factor would be even more compelling, and the third factor—that struggling with the first factor is made less necessary by the presence of other remedies—would be as well. We can see no reason to require the probably fruitless task of determining the portion of Bridgeport's increased municipal costs attributable only to victimless handgun crimes, where there are primary, and not remote, victims of the defendants' misconduct who potentially would have standing to obtain a remedy for that misconduct.[14] The fact, moreover, that the suits of those other, primary victims may not duplicate the relief sought by these plaintiffs does not automatically confer standing on these plaintiffs to bring their otherwise

[14] Of course, because the question of remoteness must be determined on a case-by-case basis; *Holmes* v. *Securities Investor Protection Corp.*, supra, 503 U.S 272 n.20; in the present case, we cannot, and do not, pass on the standing of any other such potential claimants.

remote and derivative claims. See *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, supra, 191 F.3d 241 ("even were we to assume that the single satisfaction rule would prohibit duplicative recoveries by multiple plaintiffs against a single defendant, it would not cure the ultimate problem set forth in *Holmes*, that is, that courts would be forced to 'adopt complicated rules apportioning damages' "); *Callahan* v. *A.E.V., Inc.*, 182 F.3d 237, 265–66 (3d Cir. 1999) (we are " 'unconvinced that [the potential lack of alternative plaintiffs is] sufficient to overcome the concerns about apportioning damages and, most fundamentally, the remoteness of [the plaintiffs'] alleged . . . injuries from any wrongdoing on the part of [the defendants]' ").

We are not persuaded by the plaintiffs' reliance on *Gladstone, Realtors* v. *Bellwood*, 441 U.S. 91, 99 S. Ct. 1601, 60 L. Ed. 2d 66 (1979). It is true that, in that case, the United States Supreme Court held that the village of Bellwood had standing to assert a claim, under Title VIII of the Civil Rights Act of 1968, known as the Fair Housing Act of 1968; 42 U.S.C. § 3601 et seq.; against certain realtors who were alleged to be engaged in "steering" African-American home buyers into certain areas, and away from other areas, of the village. *Gladstone, Realtors* v. *Bellwood*, supra, 111. It is also true that the basis of the village's standing was its allegations that: the realtors' steering practices significantly reduced the number of buyers in the village housing market, deflecting prices downward; perceptible increases in the minority population directly attributable to racial steering would precipitate an exodus of white residents; a significant reduction in property values directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of municipal services; and the realtors' sale practices have begun to rob the village of its racial balance and stability. Id., 109–11.

*Gladstone, Realtors* does not, however, support a conclusion that the plaintiffs in the present case have standing. The Supreme Court in that case distinguished between standing under the "case or controversy" provision of article three of the United States constitution, which involves only the constitutional minimum; id., 99; and "standing under the prudential principles by which the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." Id., 99–100. The latter principles, the court made clear, are narrower than the former. Id. The court stated: "Congress may, by legislation, expand standing to the full extent permitted by [article three], thus permitting litigation by one who otherwise would be barred by prudential standing rules." (Internal quotation marks omitted.) Id., 100. The court then interpreted the Fair Housing Act of 1968 to have incorporated the broad article three standard for determining standing, rather than the narrower prudential standard. Id., 109–15. Under that broad standard, it held the village to have standing. Id., 115. Thus, that holding does not inform the present case, in which traditional prudential standing principles are at issue.[15]

The plaintiffs also raise a procedural argument in connection with the remoteness inquiry. They contend

---

[15] It is true, as the plaintiffs point out, that there are a few trial courts that have rejected standing challenges in similar cases. See, e.g., *Boston* v. *Smith & Wesson Corp.*, Mass. Superior Court, Docket No. 1999-02590 (July 13, 2000) (12 Mass. L. Rptr. 225) (city had standing to sue firearms manufacturers, distributors and dealers for increased costs in, among other things, law enforcement, emergency services, increased security in public buildings, pensions, disability benefits, prisons and youth intervention programs). All of the appellate courts that have considered the question of the remoteness doctrine in similar cases, however, have applied it and have concluded that the particular claims asserted were too remote and derivative to confer standing on the plaintiff. See footnote 11 of this opinion.

that such an inquiry may not be raised on a motion to dismiss because it "challenge[s] proximate causation which is properly attacked in a motion to strike. This procedural error improperly denied [the plaintiffs their] substantive right to replead allegations deemed insufficient following an adverse ruling on a motion to strike." We disagree.

First, although we have considered challenges to the inextricably bound concepts of proximate causation and duty under the procedural rubric of a motion to strike; see, e.g., *Gazo* v. *Stamford*, 255 Conn. 245, 765 A.2d 505 (2001); *Mendillo* v. *Board of Education*, 246 Conn. 456, 717 A.2d 1177 (1998); we have never stated that the remoteness and derivativeness doctrine may not be considered under a motion to dismiss and *must* be deferred to a motion to strike. As we have noted, the policy considerations behind the remoteness doctrine are much the same as those involved in the questions of proximate cause and duty. Furthermore, as our standing jurisprudence indicates, directness of injury is, and has long been, a part of the standing inquiry. It may be, and we assume without deciding, that in a given case the connection between the defendant's conduct and the plaintiff's injury is so palpably direct that the question of duty should only be raised pursuant to a motion to strike. That is not the present case, however, where the connection is so palpably indirect that it would serve no useful purpose to transform what is essentially a question of standing into a question of the legal sufficiency of the complaint.

Second, we cannot perceive any additional allegations that the plaintiffs could make that could make the indirectness of their injuries more direct. It hardly bears emphasis that the plaintiff's complaint is about as complete as it possibly could be in attempting to spell out how their injuries are directly caused by the defendants' conduct. Furthermore, the plaintiffs offer

no plausible suggestion in their brief of what possible additional allegations they could have made in order to cure the indirect and derivative nature of their injuries.[16] At oral argument before this court, the plaintiffs suggested only additional allegations of a gunmaker's misconduct in marketing its products, in a case brought by individual victims of a mass shooting, which add nothing to the remoteness inquiry involved in the present case.

Our conclusion that the plaintiffs lack standing because the harms they claim are too remote from the defendants' misconduct, and are too derivative of the injuries of others, cuts across and applies to all of the plaintiffs' substantive claims as alleged in the various counts of the complaint. Because they raise other specific contentions, however, some of which apply to particular counts of their complaint, we now turn to those contentions.

## IV

### THE HOME RULE ACT

The plaintiffs, joined by the attorney general; see footnote 4 of this opinion; claim that the Home Rule Act; chapter 98 of the General Statutes; provides them with standing to pursue these claims. Specifically, they claim that § 7-148 (c) (1) (A) and (7) (H) (xi); see foot-

---

[16] There is some slight suggestion in the plaintiffs' brief that, had the case been decided on a motion to strike, they could have amended their complaint to allege nonderivative "injuries to [Bridgeport's] tangible property such as bullet holes and broken windows . . . ." This suggestion—which falls short of an assertion that, had the case been decided in the same way in the trial court albeit pursuant to a motion to strike, the plaintiffs *would* have amended their complaint to limit it to such trivial injuries—is, like their attempt to narrow their claim of standing to victimless crimes involving handguns, difficult to take seriously. Furthermore, had they done so, that would have engendered the same immense difficulty of attribution of damages: how to identify only those bullet holes and broken windows attributable to the defendants' tortious conduct, as opposed to all of the other causes of crime.

note 3 of this opinion; constitute sufficient statutory authority to bring these claims. Section 7-148 (c) (1) (A) provides that any municipality has the power to "sue and be sued," and § 7-148 (c) (7) (H) (xi) gives any municipality the power to "[p]rovide for the health of the inhabitants of the municipality and do all things necessary or desirable to secure and promote the public health . . . ." We conclude, however, that those general provisions do not override traditional requirements of standing to bring an action.

The purposes of the Home Rule Act are well established. "The purpose . . . of Connecticut's Home Rule Act is clearly twofold: to relieve the General Assembly of the burdensome task of handling and enacting special legislation of local municipal concern and to enable a municipality to draft and adopt a home rule charter or ordinance which shall constitute the organic law of the city, superseding its existing charter and any inconsistent special acts. General Statutes § 7-188; *Sloane* v. *Waterbury*, 150 Conn. 24, 26–27, 183 A.2d 839 (1962); *State ex rel. Sloane* v. *Reidy*, 152 Conn. 419, 209 A.2d 674 (1965); *Shalvoy* v. *Curran*, 393 F.2d 55, 59 (2d Cir. 1968); see Litchfield, Municipal Home Rule—Connecticut's Mature Approach, 37 Conn. B.J. 390, 402 (1963); 56 Am. Jur. 2d, Municipal Corporations § 126; 62 C.J.S., Municipal Corporations § 124. The rationale of the act, simply stated, is that issues of local concern are most logically answered locally, pursuant to a home rule charter, exclusive of the provisions of the General Statutes. See Lockard, Home Rule for Connecticut's Municipalities, 29 Conn. B.J. 51, 54 (1955). Moreover, home rule legislation was enacted to enable municipalities to conduct their own business and control their own affairs to the fullest possible extent in their own way . . . upon the principle that the municipality itself knew better what it wanted and needed than did the state at large, and to give that municipality the exclusive

privilege and right to enact direct legislation which would carry out and satisfy its wants and needs. *Fragley* v. *Phelan*, 126 Cal. 383, 387, 58 P. 923 (1899); accord 1 Antieau, Municipal Corporation Law, § 3.03; 1 McQuillin, Municipal Corporations (2d Ed.) § 93. See also *Windham First Taxing District* v. *Windham*, 208 Conn. 543, 554–55, 546 A.2d 226 (1988)." (Internal quotation marks omitted.) *Norwich* v. *Housing Authority*, 216 Conn. 112, 119, 579 A.2d 50 (1990). Furthermore, it is equally settled that a municipality, as a creation of the state, has no inherent powers of its own, and has only those powers expressly granted to it by the state or that are necessary for it to discharge its duties and carry out its purposes. *Windham Taxpayers Assn.* v. *Board of Selectmen*, 234 Conn. 513, 529, 662 A.2d 1281 (1995).

In light of these principles, we cannot read the general provisions of the Home Rule Act on which the plaintiffs rely so as to provide them with standing to bring these specific claims. The general power to sue and be sued does not mean that a municipality may bring a suit that it otherwise would have no standing to bring. Similarly, the general power to protect the health and welfare of the inhabitants of a municipality does not mean that the municipality may bring a suit with that aim that it otherwise would have no standing to bring. These general provisions are designed principally to avoid the necessity of a municipality having to petition to the General Assembly simply to secure the power to do what other corporate bodies would have the power to do. They do not, as the plaintiffs' contention suggests, eliminate the need to inquire whether a municipality has the standing to secure what it seeks to secure by judicial action.

Put another way, the plaintiffs' interpretation of the Home Rule Act would, contrary to its purposes and to its long-standing interpretation regarding the powers

of municipalities, give a municipality unlimited power to sue for whatever it deemed worth suing for, irrespective of whether it had standing to do so. Indeed, the general language giving a municipality the power to "sue and be sued" is the same language contained in General Statutes § 33-647 (1),[17] regarding the general powers of business corporations, and General Statutes § 33-1036 (1),[18] regarding the general powers of nonstock corporations. No one would think that these general provisions give a corporation the power to assert a claim in court that it had no standing to assert. There is no reason to think that the Home Rule Act nonetheless does so for municipal corporations.

We have no doubt that the legislature could, by appropriate legislation, confer standing on a municipality to bring a suit such as this. The Home Rule Act, however, is not that legislation.

V

COMMON-LAW PUBLIC NUISANCE

The plaintiffs also claim that they have standing under the fourth count of their complaint, in which they allege a claim of common-law public nuisance. They claim that, with respect to their public nuisance claim, they seek to recover for losses "that are not derivative because the government incurs them regardless of

---

[17] General Statutes § 33-647 provides in relevant part: "Unless its certificate of incorporation provides otherwise, every corporation has perpetual duration and succession in its corporate name and has the same powers as an individual to do all things necessary or convenient to carry out its business and affairs, including without limitation power:

"(1) To sue and be sued, complain and defend in its corporate name . . . ."

[18] General Statutes § 33-1036 provides in relevant part: "Unless its certificate of incorporation provides otherwise, every corporation has perpetual duration and succession in its corporate name and has the same powers as an individual to do all things necessary or convenient to carry out its affairs, including without limitation power:

"(1) To sue and be sued, complain and defend in its corporate name . . . ."

whether individuals are also harmed." Although this is the most persuasive of the plaintiffs' claims for standing, we nonetheless conclude that they lack standing under their fourth count as well.

"The essential element of the concept of nuisance is a continuing inherent or natural tendency to create danger and inflict injury." *Carabetta* v. *Meriden*, 145 Conn. 338, 339, 142 A.2d 727 (1958). We have defined the concept of public nuisance as follows. "Nuisances are public where they violate public rights, and produce a common injury, and where they constitute an obstruction to public rights, that is, the rights enjoyed by citizens as part of the public. . . . [I]f the annoyance is one that is common to the public generally, then it is a public nuisance. . . . The test is not the number of persons annoyed, but the possibility of annoyance to the public by the invasion of its rights. A public nuisance is one that injures the citizens generally who may be so circumstanced as to come within its influence. *Nolan* v. *New Britain*, 69 Conn. 668, 678, 38 Atl. 703 [1897]; *Hassett* v. *Palmer*, 126 Conn. 468, 476, 12 Atl. (2d) 646 [1940]; *Croughwell* v. *Chase Brass & Copper Co.*, 128 Conn. 110, 112, 20 Atl. (2d) 619 [1941]." (Citation omitted; internal quotation marks omitted.) *Higgins* v. *Connecticut Light & Power Co.*, 129 Conn. 606, 611–12, 30 A.2d 388 (1943). Moreover, a private individual may create a nuisance in a public place. Id., 611. Typical examples of public nuisances are: pollution and obstruction of waterways; air and noise pollution; maintenance of a fire or explosion hazard, or other unsafe premises; maintenance of a house of prostitution; obstruction of safe travel on a public highway; and maintenance of a junkyard or dump. 1 D. Pope, Connecticut Actions and Remedies, Tort Law (1993) § 9.03, pp. 9-6 through 9-9.

We acknowledge that the definition of a common-law public nuisance is, without more, capacious enough

to include the allegations of the plaintiffs' complaint. One might well say that the harms alleged by the plaintiffs to have been caused by the defendants' conduct are harms that injure the citizens of Bridgeport who may be so circumstanced as to come within the influence of that conduct. That is not enough, however, in our view, to answer the antecedent question of whether those harms are nonetheless too remote from that conduct to confer standing on the plaintiffs to complain of them.

As we already have stated, the remoteness doctrine, as a limitation on standing premised on policy reasons, cuts across and applies to all of the plaintiffs' substantive claims, including their public nuisance claim. There is no sound reason to withhold that policy analysis from this one common-law cause of action. That analysis, applied to the plaintiffs' public nuisance claim, leads to the same conclusion of remoteness.

First, the number of steps in the causation chain under this substantive cause of action is the same as under any of the others. That lengthy chain suggests the same degree of remoteness here as elsewhere.

Second, application of the three policy factors delineated in part III of this opinion leads to the same conclusion here. The potential causes of crime in Bridgeport are no less myriad under this claim, and would involve the same immense difficulty of attribution. It is true that, under a public nuisance theory, presumably the second factor—apportioning damages among various plaintiffs in order to avoid double recoveries and double liabilities—might be considered irrelevant here, because a public nuisance by definition injures all in a common way. That argument does not take into account, however, the fact that, nonetheless, the harms claimed by the plaintiffs do derive from injuries to other primary victims, as we have discussed previously. Although public nuisances also may involve injuries

to private parties within the sphere of the tortfeasor's conduct, they do not ordinarily derive solely from conduct that harms private parties primarily and directly, and the public at large only derivatively, as in the present case. Finally, the third factor—struggling with the other factors is unnecessary where there are others directly injured who can remedy the harm without those attendant problems—applies here as well, at least in large part. Struggling with the problem of attribution of the causes of the harms alleged is unnecessary because there are others directly injured who can remedy the harms by direct action against the defendants.

Thus, whether the remoteness doctrine applies in a given case depends, not on the form or label of the cause of action to which it may be applied, but instead, on its underlying rationale and policy, and the application thereof to the facts of the case. Indeed, this is the teaching of the case law applying the remoteness doctrine to various common-law and statutory causes of action. See footnote 11 of this opinion. We conclude that its rationale and policy apply to the facts of the present case, even when those facts are stated in the form of a common-law public nuisance. Moreover, we have found no case, and the plaintiffs have suggested none, in which a plaintiff situated as remotely from the defendants' conduct as these plaintiffs are, or who presented a chain of causation as lengthy and multifaceted as these plaintiffs have, nonetheless has been held to have standing to assert a public nuisance claim. Compare, e.g., *Keeney* v. *Old Saybrook*, 239 Conn. 786, 790, 686 A.2d 991 (1997) (pollution of groundwater and Connecticut River resulting from malfunctioning septic systems constituted public nuisance); *Balf Co.* v. *Hartford Electric Light Co.*, 106 Conn. 315, 322–23, 138 A. 122 (1927) (conduit connecting two properties, which was constructed over river and which barred all navigation, constituted public nuisance); *Platt Bros. & Co.* v. *Water-*

*bury*, 80 Conn. 179, 182, 67 A. 508 (1907) (discharge of city sewage into stream constituted public nuisance).

## VI

## THE CONNECTICUT UNFAIR TRADE PRACTICES ACT

The plaintiffs next claim that they have standing to assert their claim under their CUTPA count; General Statutes § 42-110a et seq.; see footnote 4 of this opinion. In this contention, they are joined by the attorney general, as amicus curiae, who presents a different argument for the plaintiffs' standing under this count. The plaintiffs challenge the trial court's conclusions that, in order to have standing to assert a CUTPA claim: (1) one must be either a consumer, competitor or in some business or commercial relationship with the defendant and, in that capacity, be affected by the defendants' unfair or deceptive conduct; and (2) the plaintiffs did not fall into any of those categories. The attorney general argues that the only standing requirement of a CUTPA claim is the statutory language that the plaintiff suffer "any ascertainable loss of money or property" as a result of the defendant's prohibited conduct.[19] General Statutes § 42-110g (a).

We conclude that the ascertainable loss requirement of CUTPA does not displace the remoteness doctrine as a standing limitation, and that the same reasons of remoteness and derivativeness that we have explained earlier apply to the CUTPA claim. This conclusion renders it unnecessary to consider whether CUTPA standing is confined to consumers, competitors and those in some business or commercial relationship with the defendants.

---

[19] The attorney general also argues that even if the trial court was correct that CUTPA requires a commercial relationship between the plaintiffs and the defendants, that requirement was satisfied in the present case. We need not reach this contention.

We acknowledge that CUTPA is a remedial statute that must be accorded a liberal interpretation in favor of those whom the legislature intended to benefit. General Statutes § 42-110b (d);[20] *Concept Associates, Ltd.* v. *Board of Tax Review*, 229 Conn. 618, 623, 642 A.2d 1186 (1994). Applying that principle to confer standing on the plaintiffs in the present case, however, irrespective of the remoteness doctrine, would render CUTPA virtually limitless. We do not think that the legislature intended such a result.

If the only standing requirement under CUTPA were that, as a result of the defendant's prohibited conduct, the plaintiff suffered an "ascertainable loss of money or property"; General Statutes § 42-110g (a); then any plaintiff who could, in a "but for" cause sense, trace his or her loss to the defendant's wrongful conduct, would have standing to assert a CUTPA claim against the defendant, irrespective of how remote or derivative that loss was. That would render CUTPA subject to yielding bizarre results.[21] We do not read statutes to yield such results; *Southington* v. *Commercial Union Ins. Co.*, 254 Conn. 348, 360, 757 A.2d 549 (2000); and CUTPA is no exception.

The only sensible conclusion is that CUTPA, like other statutory and common-law claims, is subject to the remoteness doctrine as a limitation on standing. For all of the reasons given, that doctrine requires the conclusion that the plaintiffs lack standing under their CUTPA count.

---

[20] See footnote 4 of this opinion for the text of § 42-110b (d).

[21] Consider, for example, that deceitful merchant A causes B to lose a great deal of money, as a result of which B defaults on a large loan from C, as a result of which C's business fails, as a result of which C's creditors D, E, F and G each suffers an ascertainable loss of money. Under the reasoning employed by the attorney general, not only B, but C, D, E, F and G—and others down the line from G—would have standing to sue A under CUTPA. We do not think that the legislature intended such a bizarre result simply because CUTPA is remedial in nature.

## VII

## THE CONNECTICUT PRODUCT LIABILITY ACT

The plaintiffs' final contention is that they have standing to assert their claim under the Product Liability Act. See footnote 5 of this opinion. In this regard, they reassert their earlier arguments that the question of remoteness should have been deferred to the question of proximate cause to be raised by way of a motion to strike, rather than determined as a matter of standing pursuant to a motion to dismiss, and that the injuries they claim are direct and not derivative. We already have considered and rejected these arguments.

The judgment is affirmed.

In this opinion the other justices concurred.