[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: PLAINTIFF'S MOTION TO DISQUALIFY DEFENDANT'S COUNSEL #112
 FACTS
On October 9, 2001, the plaintiffs, Staci Meehan and Chad Wright, filed a nine-count[1] complaint against the defendants, Mark Antonino, John Antonino, Girard Toyota/BMW of New London, and Joseph Pangelinan, sounding in claims of conversion and forgery, and alleging violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110, et seq. On October 18, 2001, the plaintiffs amended their complaint to replace the originally named defendant, Girard Toyota/BMW of New London (Girard Toyota), with Car Services, Jnc. (Car Services), the legal entity doing business under Girard Toyota.[2] On February 19, 2002, the court, Corradino, J, granted the defendants' motion to dismiss counts one through eight of the complaint as to Wright on the ground that Wright lacked standing. On February 25, 2002, the plaintiffs amended their complaint and added count ten, which alleges CUTPA violations by Car Services.
The plaintiffs allege the following facts. John Antonino is the president and owner of Antonino Acura in Groton and is the president of Car Services. John Antonino has an adult son, Mark Antonino. Meehan is the owner of a 2001 BMW M-3 convertible, which at the time of the incidents giving rise to this action, was a special-order showcase car unavailable to the general public. Chad Wright was an assistant parts manager at Antonino Acura until shortly before this action was initiated, and resides with Meehan in Gales Ferry.
In early June,[3] Wright drove Meehan's BMW convertible to Car Services for repairs to its hood and minor engine work. The car was returned to Wright approximately one month later, and payment for the repairs was made in an amount in excess of $3000. Ten days following the return of the vehicle, the plaintiffs returned from vacation to Logan Airport in Boston, and found that the BMW would not start and the CT Page 13799 convertible top locked in a ninety-degree angle position. The plaintiffs were required to manually disassemble the top and pay for service to jumpstart the car to return it to Car Services, who thereafter retained the car to service it. At the end of four weeks, the top continued to lock at a ninety-degree angle. Car Services informed Wright that more parts were required, then manually lowered the convertible top to render the car operational while the parts were ordered.
On August 29, 2001, Wright delivered Meehan's car to the service shop at Car Services. Car Services and Wright completed a work order invoice, signed by Wright, which included a record of the car's odometer reading. While the car was at the service shop, damage occurred to the leatherwork on the driver's seat, the driver's door, the right rear wheel rim and the right front side of the car and the odometer reading on the work order invoice contained a handwritten alteration. John Antonino and Car Services refused to repair the damage or refund the payments made for service. This action resulted.
On January 25, 2002, the plaintiffs filed a motion to disqualify the defendants' counsel, the law offices of George J. Duborg and Suisman, Shapiro, Wool, Brennan, Gray Greenberg, P.C., who jointly represent all defendants, on the ground that their clients' interests are adverse. Attached to the motion is a memorandum of law in support. On January 30, 2002, Attorney Frank J. Liberty of Suisman, Shapiro, Wool, Brennan, Gray Greenberg, P.C. filed a motion with an attached affidavit to withdraw from the representation of Pangelinan only. On February 13, 2002, Attorney Liberty filed an objection to the motion to disqualify counsel. On February 19, 2002, the defendants, through Attorney Ottaviano of the law offices of George Duborg, filed "an objection to the motion to disqualify with an attached memorandum of law. On February 25, 2002, and March 7, 2002, the plaintiffs filed supplemental memoranda of law in response to the defendants' objection to the motion to disqualify and based on newly obtained information, respectively.
 DISCUSSION
"The trial court has the authority to regulate the conduct of attorneys and has a duty to enforce the standards of conduct regarding attorneys. . . . Since October, 1986, the conduct of attorneys has been regulated also by the Rules of Professional Conduct. . . . The trial court has broad discretion to determine whether there exists a conflict of interest that would warrant disqualification of an attorney." (Citations omitted.) Bergeron v. Mackler, 225 Conn. 391,397, 623 A.2d 489 (1993). CT Page 13800
"Disqualification of counsel is a remedy that serves to enforce the lawyer's duty of absolute fidelity and to guard against the danger of inadvertent use of confidential information . . . In disqualification matters, however, we must be solicitous of a client's right freely to choose his counsel . . . mindful of the fact that a client whose attorney is disqualified may suffer the loss of time and money in finding new counsel and may lose the benefit of its longtime counsel's specialized knowledge of its operations." (Citations omitted; internal quotation marks omitted.) Id., 397-98.
"A party moving for disqualification of an opponent's counsel must meet a high standard of proof" (Internal quotation marks omitted.) Chaiklinv. Bacon, Superior Court, judicial district of Hartford, Docket No. CV 99 0594039 (June 30, 2000) (Rubinow, J.). "The party moving for disqualification bears the burden of proving facts which indicate that disqualification is necessary. . . . The disqualification of a party's chosen counsel is a harsh sanction, and an extraordinary remedy which should be resorted to sparingly." (Internal quotation marks omitted.)Gregg v. Case, Superior Court, judicial district of New Britain, Docket No. CV 97 0478441 (January 26, 1999, Robinson, J.) (23 Conn. Law Rptr. 694, 695). "The standards for attorney disqualification are directed at protecting client confidences. They may not be used to restrict an individual's ability to select counsel of choice on the basis of nothing more than a litigant's subjective perception that another litigant is influencing the proceedings." Bergeron v. Mackler, supra, 225 Conn. 400.
The plaintiffs argue that because Pangelinan informed Wright that he would testify under oath that the odometer reading was falsely altered by someone other than himself, that the work order and keys to Meehan's BMW were temporarily missing and unaccounted for while the car was in for repairs, and "that co-defendant, John Antonino (unlawfully) instructed [Pangelinan] not to release the work order to either plaintiff after plaintiff discovered that the work order was falsified," the defendants' interests are directly adverse and counsel cannot zealously advocate and fully safeguard the defendants' confidences in conformity with Rules of Professional Conduct 1.6 and 1.7.[4]
The plaintiffs contend further that because John Antonino filed a complaint with the New London Police Department, accusing Pangelinan of felony larceny in an unrelated incident at Car Services, Inc., which resulted in an arrest warrant being issued for Pangelinan's arrest, the defendants' counsel have no reasonable means to safeguard Pangelinan's confidences.
Moreover, the plaintiffs argue that continued joint representation by CT Page 13801 the defendants' counsel jeopardizes the plaintiffs' interests in discovery of the truth in that Pangelinan's exculpatory trial strategies are subverted by counsels' conflicting loyal ties to hostile codefendants; that Pangelinan's counsel "cannot, and will not, impeach co-defendants whose testimony or pleadings will adversely affect Mr. Pangelinan's credibility and best interests," and co-defendants can obtain an unfair advantage over the plaintiffs and Pangelinan because acquisition and possession of confidential information about Pangelinan will increase the co defendants' ability to impeach Pangelinan. The plaintiffs argue further that they have standing because they claim that allowing defendants' counsel to remain "jeopardizes [their] interests in the proper functioning of the adversarial system. . . ." The defendants argue that the plaintiffs lack standing to bring a motion to disqualify.
"It is axiomatic that a party must have standing to assert a claim in order for the court to have subject matter jurisdiction over the claim. . . . Our standing jurisprudence consistently has embodied the notion that there must be a colorable claim of a direct injury to the plaintiff, in an individual or representative capacity." (Citation omitted.) Gamm v. Smith Wesson Corp., 258 Conn. 313, 346,780 A.2d 98 (2001). "Standing focuses on whether a party is the proper party to request adjudication of the issues, rather than on the substantive rights of the aggrieved parties. . . ." (Internal quotation marks omitted.) Id., 347.
"The Rules of Professional Conduct recognize the potential for conflicts in an attorney's [or one firm's] representation of co-parties because of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question." (Internal quotation marks omitted.)Vitone v. Waterbury Hospital, Superior Court, judicial district of Waterbury, Docket No. CV 970139262 (December 7, 2001, West, J.) (31 Conn. Law Rptr. 48, 50). "Resolving questions of conflict of interest is primarily the responsibility of the lawyer undertaking the representation . . . Where the conflict is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question. Such an objection should be viewed with caution, however, for it can be misused as a technique of harassment." (Internal quotation marks omitted.) Id.
In the present case, the plaintiffs assert that Pangelinan may testify that the odometer was altered by someone other than himself, that John Antonino instructed Pangelinan to withhold the work order from the plaintiffs, and that Meehan's BMW and work order were missing and CT Page 13802 unaccounted for while the vehicle was in for service. There exists, however, no affidavit, deposition testimony or party admission to substantiate these claims. The plaintiffs also assert that the arrest warrant issued against Pangelinan, as a result of the allegations of one of his co-defendants in a matter wholly unrelated to the present action, renders the co-defendants' interests in the present action adverse, and Pangelinan's rights will be disadvantaged. While the plaintiffs argue that as a result of Pangelinan's alleged disadvantage, their interest in discovering the truth is jeopardized, they fail to clearly call in question the fair administration of justice. The plaintiffs have failed to provide substantiation for their arguments that Pangelinan will testify against his co-defendant, John Antonino, and there is no indication that counsel for the defendants have violated the rules of professional conduct. The plaintiffs, therefore, lack standing.
For the foregoing reasons, the plaintiffs' motion to disqualify defendants' counsel is denied.
D. Michael Hurley, JTR